**VIRGINIA VERMICULITE, LTD., Plaintiff,**

v.

**W.R. GRACE & CO.—CONN., and the Historic Green Springs, Inc., Defendants.**

**No. CIV. A. 395CV00015.**

United States District Court, W.D. Virginia. Charlottesville Division.

May 24, 2001.

Roger Scott Martin, Charlottesville, VA, Jane Champion Clarke, David Zev Izakowitz, Woods, Rogers & Hazlegrove, P.L.C., Charlottesville, VA, for Virginia Vermiculite, Ltd.

Thomas Eugene Albro, Patricia D. McGraw, Tremblay & Smith, Charlottesville, VA, David S. Copeland, Randolph S. Sherman, Eric L. Aaronson, Kaye, Scholer, Fierman, Hays & Handler, New York, NY, for W.R. Grace & Co.—Conn.

Michael Eugene Derdeyn, McGuire, Woods, Battle & Boothe, Charlottesville, VA, Charles H. Montange, Seattle, WA, Sara Lee Gropen, Rae H. Ely & Associates, Louisa, VA, Jane Champion Clarke, Woods, Rogers & Hazlegrove, P.L.C., Charlottesville, VA, for the Historic Green Springs, Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL, Senior District Judge.

With the consent of the parties, the court tried this case without a jury. The trial began on September 11, 2000, and ended on October 2, 2000. Having thoroughly considered all of the evidence and testimony, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Inevitably, in a case as complex as that at the bar, some findings of fact involve mixed questions of fact and law. In those instances, findings of fact and conclusions of law have been stated as a unit as an aid to following the flow of information and the impact of that flow on the conclusions of law. By main strength and awkwardness, the fact matters and the law conclusions could have been separated, but it is thought that the sometimes combined usage herein, and occasional repetition thereof, are more conducive to the proper flow of the opinion's analysis.

### JURISDICTION

The court has original jurisdiction over this civil action pursuant to 15 U.S.C. §§ 15, 22, 26, and 28 U.S.C. §§ 1331, 1337, 1367.

### ISSUES PRESENTED

The issues presented are as follows:

1. Whether the plaintiff, Virginia Vermiculite, Limited ("VVL"), proved by a preponderance of the evidence that the remaining defendant, The Historic Green Springs, Incorporated ("HGSI"), conspired to monopolize in violation of the Sherman Act and Virginia Antitrust Act. *See* 15 U.S.C.A. § 2 (West 1997 & Supp.2000); Va.Code Ann. § 59.1–9.6 (Michie 1998 & Supp.2000).

2. Whether VVL proved by clear and convincing evidence that HGSI conspired to injure VVL in its reputation, trade, business, or profession, in violation of the Virginia Conspiracy Act. *See* Va.Code Ann. §§ 18.2–499, –500 (Michie 1996 & Supp. 2000).

## FINDINGS OF FACT

1. VVL is a Virginia limited partnership engaged in the business of mining, processing, and selling a mineral known as vermiculite. (Stipulation of Facts (Aug. 23, 2000) ("Stip.") ¶ 1.)

2. W.R. Grace & Co.-Conn. ("Grace") is a Connecticut corporation engaged in the supply of specialty chemical, construction, and container products servicing the food, consumer products, petroleum refinery, and construction industries. One of Grace's businesses is engaged in the mining, processing, and selling of vermiculite. (Stip.¶ 2.) Grace was a defendant in this and two previously consolidated cases, but reached a settlement with VVL immediately prior to trial. On the first day of trial, the court endorsed the settlement and dismissed Grace from all three actions.

3. HGSI is a Virginia nonprofit corporation dedicated to the preservation of the Green Springs National Historic Landmark (the "District" or "Landmark District"). (Stip.¶ 53.)

4. The Landmark District is located in Louisa County, Virginia. It covers an area of approximately 14,000 acres, and is roughly the shape of an oval basin seven miles long and five miles wide. (Def.'s Trial Ex. ("DTX") 92.)

5. The Landmark District was designated a national landmark because it contains a wide variety of historic homes in a clearly-defined rural landscape. (Trial Transcript ("Tr.") at 2134–35.)

6. The Landmark District also contains substantial deposits of vermiculite.

7. Vermiculite is a naturally-occurring, mica-like mineral found in the ground. (Stip. ¶ 3; Pl.'s Trial Ex. ("PTX") 383 at 16772.)

8. Mining is accomplished by the "open pit" method using bulldozers, draglines, and backhoes. The topsoil is removed and stockpiled for later reclamation. (PTX 383 at G16786; Tr. at 122–23, 179–84.)

9. When vermiculite is mined, the ore is taken to a processing plant or mill relatively close to the mining site, and processed to remove moisture, rock, dirt, dust, extraneous material, and small particles of vermiculite that are not saleable (collectively, the "tailings"). (Stip. ¶ 4; Tr. at 121–23, 140.)

10. To transport the ore from the mine to the processing mill, mining companies typically load the ore onto multi-ton dump trucks, which then carry the ore to the mill. (*E.g.*, Tr. at 969; PTX 383 at G16786.)

11. For example, at VVL's South Carolina operations, the trucks must travel an average distance of ten to fifteen miles from the mining site to the mill. (Tr. at 969.) Grace's average haul distance is twelve miles. (PTX 383 at G16786.)

12. The result of the processing operations at the mill is vermiculite concentrate, which is separated by grade according to the size of the flakes. (Stip.¶ 5.)

13. The United States grading system classifies vermiculite into various size ranges, including grades 3, 4, and 5, (Stip.¶ 6), grade 3 being coarser than the finer grades, 4 and 5. (PTX 11A–11G.)

14. Most applications for vermiculite require that the concentrate be heated in a process known as "exfoliation" or "expansion." This process causes the vermiculite to expand or pop in much the same way as popcorn pops when heated. (Stip.¶ 7.)

15. Vermiculite is fireproof, and is used in a variety of horticultural, agricultural, industrial, and construction applications. (Stip.¶ 8.)

16. Some of the applications for expanded vermiculite include the production of lightweight concrete, soil mixes, fertilizers, masonry block insulation, and spray-on fireproofing. (Stip.¶ 9.)

17. Vermiculite is mined in a limited number of specific locations throughout the world, including the United States, China, Brazil, Australia, and Russia, and certain countries in Africa. It is imported primarily from companies doing business in South Africa and China. (Stip.¶ 10.)

18. In the United States, commercially-viable reserves of vermiculite ore have been mined only in Virginia, South Carolina, and Montana. (Tr. at 169–71, 1395–96; PTX 117.)

19. The three largest participants in the world-wide vermiculite industry are the South Africa-based Palabora Mining Company ("Palabora"), Grace, and VVL. (Stip.¶ 11.)

20. Palabora is the largest single producer of vermiculite in the world, and currently has twenty-five years' worth of reserves (or, "mining rights") in Africa. (Stip.¶ 12.)

21. Grace and VVL are the second- and third-largest vermiculite producers in the world, respectively. (Stip.¶ 13.)

22. VVL owns mining rights, conducts mining operations, and operates vermiculite processing plants in Virginia and South Carolina. (Stip.¶ 15.)

23. VVL's South Carolina operation, Carolina Vermiculite ("CVC"), is a division of VVL; it is not a separate corporation. (Tr. at 888.)

24. CVC does not process any vermiculite mined in Virginia. (Stip.¶ 16.)

25. Grace currently conducts mining operations only in South Carolina. Grace previously mined in Montana (but ultimately closed those operations), and never mined in Virginia. (Stip.¶ 18.)

26. Grace sells and uses vermiculite internally, and also sells both vermiculite concentrates and expanded vermiculite to third parties. (Stip.¶ 21.)

27. Grace and VVL primarily sell their vermiculite in North America, although Grace also exports some vermiculite outside of North America. (Tr. at 152–53, 1346–50, 1374; PTX 76 at G015524, G015598; PTX 383 at G16770, G16778–83.)

28. At least 2,000,000 tons of vermiculite reserves in South Carolina remain unleased by any mining company. (Stip.¶ 20.)

29. North American vermiculite concentrate sales for 1991–1998 are shown in Table 1. (Stip.¶ 14.)

30. In the 1960s, Grace was mining in Montana and in South Carolina, and believed it would need a "third mill" to replace depleting reserves or to add to existing reserves. (Stip.¶ 23.)

31. Grace had a number of core businesses that were dependent upon vermiculite, and deemed it prudent to increase its

vermiculite holdings on the East Coast. (DTX 138 at G003120.)

32. To that end, Grace acquired substantial mining rights in Louisa County throughout the 1970s, either by buying properties containing vermiculite, or by leasing land from Louisa County property owners. Grace initially acquired the Louisa County reserves with the intent to mine them. Grace also purchased land that did not contain vermiculite reserves because of the land's logistical benefit to Grace's future mining operations. (Stip.¶ 24.)

33. Two of those Louisa County property owners were Millard Fillmore Peers, Jr. ("M.F. Peers"), and his wife, Norma Peers (collectively, the "M.F. Peerses"). (Stip.¶ 25.) The M.F. Peerses were plaintiffs in the previously-consolidated cases against Grace, but those cases were dismissed when Grace settled with the M.F. Peerses and with VVL.

34. M.F. Peers testified at trial. His testimony was credible, unrefuted, and subject to virtually no cross-examination.

35. Mr. Peers was born in the District in 1913, and has lived there for seventy-five years. His father was a career farmer, and purchased 1300–1400 acres in Louisa County in the 1920s. His father often used his land for commercial purposes, such as by selling gravel from the river bed to be used in concrete, and by leasing his property to be used as an airport landing strip and as a drag strip. (Tr. at 496–509.)

36. Mr. Peers and his brother, Alfred Dabney Peers ("A.D. Peers"), acquired land under their father's will. Together they owned approximately 2000 acres in Louisa County. (Tr. at 510–11.)

37. As a farmer, M.F. Peers approved of vermiculite mining. His father often remarked that "he didn't think [they] were going to make a living off of the top of the ground and he thought it would have to come out of the underground." (Tr. at 523–24. *See also* Tr. at 526; PTX 42.)

38. Grace told M.F. Peers that Grace was depleting its reserves in South Carolina, that it did not have enough reserves to last another two years, and that it wished to buy, and then mine, M.F. Peers's property. (Tr. at 536–37.)

39. On December 27, 1972, Grace purchased two parcels from M.F. Peers (the "M.F. Peers properties"). (Stip. ¶ 26; PTX 47, 48.)

40. The first parcel ("Parcel I") contains 262.98 acres, and the second parcel ("Parcel II" or the "River Property") contains 276.42 acres. (Stip.¶ 27.)

41. About half of Parcel I is located within the boundaries of the Landmark District. Approximately one-third of Parcel II is located within the Landmark District, that third being a peninsula-shaped tract of land comprising the southern portion of the parcel, the property line of which more or less follows the contours of the South Anna River. (PTX 3.)

42. Grace entered into an agreement with the M.F. Peerses pursuant to which Grace would pay "per ton" royalties to the M.F. Peerses, if Grace, in its sole discretion, decided to mine the M.F. Peers properties. (Stip. ¶ 28; PTX 47, 51.)

43. Notwithstanding the discretionary clause, Grace promised M.F. Peers that it was going to mine the properties within two years. (Tr. at 536–38.)

44. M.F. Peers sold his land to Grace with the expectation that he would receive royalties from the mining. The sale price was lower than it otherwise would have been, to take account of the royalties M.F. Peers expected to receive. (Tr. at 536–37.)

45. Grace knew of M.F. Peers's expectations when it purchased his properties. (Tr. at 536–38; PTX 45.)

46. Grace never mined the properties or paid a per ton royalty (or any royalty) to the M.F. Peerses. (Stip. ¶ 29.)

47. Also in 1972, HGSI was incorporated to preserve the Green Springs area, and, essentially, to prevent what it viewed as developmental threats to the area. (Tr. at 1650–62; Stip. ¶ 54.)

48. Rae H. Ely, a Louisa County resident, at various times has served as officer, director, and attorney for HGSI, and currently is HGSI's President. (Stip. ¶ 57.)

49. From the time Grace began acquiring properties in Louisa County, Grace faced substantial opposition to its mining plans from HGSI, specifically from Ms. Ely, (Stip. ¶ 57), who began conducting intensive research into the vermiculite industry, frequently appeared in opposition to Grace at meetings of the Louisa County Board of Supervisors, studied the area, advised local residents about mining and preservation, and organized grass-roots efforts to oppose mining and development. (E.g., Stip. ¶ 58; (Ely dep. (Apr. 14, 1999) at 430); PTX 457, 458, 460; Tr. at 1689–91, 1869–84.)

50. HGSI opposed Grace because many of the properties Grace acquired in Louisa County were located within, or adjacent to, the Landmark District. (Tr. at 1659; Stip. ¶ 56; PTX 2, 3, 457.)

51. As noted supra, A.D. Peers and his wife, Elizabeth D. Peers (collectively, the "A.D. Peerses"), also owned land in Louisa County. (Stip. ¶ 30.) Like M.F. Peers, A.D. Peers was born in Louisa County and lived there nearly all of his life. (Tr. at 498–99.)

52. Grace purchased two parcels from the A.D. Peerses on December 27, 1973: the 36.62 acre "Parcel A," on which the A.D. Peerses resided, and the 228.99 acre "Parcel B" (the "A.D. Peers properties"). (Stip. ¶ 31; PTX 49.)

53. Parcel A is located entirely within the boundaries of the Landmark District, and more than half of Parcel B is located within the District. (PTX 3.)

54. An unrecorded agreement entered into on the same day of the property sale (the "1973 Agreement") established a per ton royalty rate that Grace would pay the A.D. Peerses, in the event that Grace, in its sole discretion, decided to mine the property. (Stip. ¶ 32; PTX 50.)

55. The 1973 Agreement contained a royalties provision, whereby Grace would pay the A.D. Peerses one dollar per ton of vermiculite mined, or a rate no less than the rate Grace paid others in the Louisa County area, in the event that Grace decided to mine. (Stip. ¶ 33.)

56. Although Grace retained sole discretion to decide whether to mine, the 1973 Agreement contained detailed provisions about when royalty payments were to be made, what statements Grace was required to give the A.D. Peerses, including what quantity and type of ore was removed, and what procedure the A.D. Peerses could follow to inspect Grace's records. (Stip. ¶ 34.)

57. When the A.D. Peerses sold their property to Grace, they did so with the expectation that the property would be mined and that they would receive royalties. (E.g., PTX 45.)

58. Grace was aware of these expectations, (PTX 45), and believed that the A.D. Peers properties contained commercially-valuable vermiculite reserves. (Stip. ¶ 37.)

59. Under the 1973 Agreement, the A.D. Peerses also retained the right to occupy the premises until Grace notified the A.D. Peerses of its intent to resell or

mine the property, at which time the A.D. Peerses could continue to occupy the premises until the date of closing of the resale, or for one year after Grace provided notice of intent to mine. (Stip.¶ 35.)

60. The 1973 Agreement also contained a provision stating that, for thirty days after Grace's notice of intent to resell the property, the A.D. Peerses would have the option of buying back Parcel A. (Stip.¶ 36.)

61. Grace never mined the A.D. Peers properties or paid a per ton royalty to the A.D. Peerses for vermiculite actually mined. Grace paid the A.D. Peerses $50,000 in advance royalties, although it was not required to do so under the 1973 Agreement. (Stip. ¶ 38; PTX 52.)

62. "Advance royalties," or "advanced mineral royalties," were prepayments of royalties which would be applied against actual royalties owed, if and when mining began. (PTX 52, 301.)

63. J. Murray and Ruth Hill also owned property in Louisa County, known as "Brandy Farm." (Stip.¶ 39.)

64. On December 27, 1973, Grace leased a 60.24 acre parcel from the Hills known as "Brandy A." (Stip.¶ 40.)

65. The Hills lived on a 37–acre parcel. That parcel is known as "Brandy B." (Stip.¶ 41.)

66. Both parcels of the Brandy property are located entirely within the boundaries of the Landmark District. (PTX 3.)

67. Grace entered into an agreement to pay royalties to the Hills if Grace decided, in its sole discretion, to mine Brandy A. ("Brandy Agreement") (Stip. ¶ 42; *cf.* PTX 55 at H0726.)

68. Under the Brandy Agreement, Grace had the duty of maintaining the buildings on Brandy B as long as the Hills lived there. (Stip.¶ 43.)

69. The Brandy Agreement provided in part that, once the Hills vacated Brandy B, "no person shall use or occupy any of the buildings ... on [Brandy B] without Grace's prior written permission and upon such conditions as Grace may reasonably impose." (Stip.¶ 44.)

70. On March 13, 1974, largely through HGSI's efforts, the Landmark District was designated a national landmark. (Stip. ¶ 52; DTX 92 at 3.)

71. Ms. Ely collected preservation easements on nearly half the acreage in the District and offered most of them to the Secretary of the Interior, who subsequently assigned management of the properties to the National Park Service. (PTX 312 at 010445; DTX 92 at 3.) The National Park Service entered into a cooperative agreement with HGSI to manage those easements. (DTX 92 at 6.)

72. On May 17, 1976, Grace leased a 255.53 acre parcel from Elgin H. and Betty Craig Nininger, known as the "Nininger property." (Stip.¶ 47.)

73. The Nininger property is located entirely within the boundaries of the Landmark District. (PTX 3.)

74. The Nininger lease term ran for thirty-five years, through May 17, 2011. (PTX 306.) The lease created no obligation upon Grace to mine the premises, leaving the decision to mine in Grace's discretion. (*Cf.* PTX 56 at H0361.)

75. The Nininger property contains vermiculite reserves estimated by Grace in 1992 to be approximately 700,000 tons. (Stip.¶ 97.)

76. The Nininger property is zoned for vermiculite mining. (Stip.¶ 98.)

77. Grace never mined the Brandy or Nininger properties. (Stip.¶ 48.)

78. In 1976, VVL leased and began mining its first property in Louisa County,

known as the "Purcell property." (Stip. ¶¶ 49, 59; Tr. at 112.)

79. The Purcell property contains 459 acres, of which VVL leased approximately 120 acres, containing reserves of approximately 580,000 tons of vermiculite concentrates. (Stip.¶ 50.)

80. The Purcell property is located entirely within the boundaries of the Landmark District. (PTX 3.)

81. The relative geographic positions of these properties are as follows. The point of reference is Route 22 in Louisa County, which runs east to west. Nininger is located south of Route 22, and all of the other properties are located north of Route 22. Of the northern properties, Purcell is located furthest east. West of Purcell is M.F. Peers Parcel II. That parcel is a wooded area adjacent to the South Anna River. West of the southern portion of M.F. Peers Parcel II are the Brandy parcels. Consequently, M.F. Peers Parcel II lies directly between the Brandy and Purcell properties. The Brandy properties also lie directly north of the Nininger property, across Route 22. The A.D. Peers properties are situated west of the Brandy properties. West of A.D. Peers is the other M.F. Peers property, Parcel I. (Stip. ¶ 51; PTX 3; Tr. at 110–19.)

82. Overall, Grace purchased 1084 acres and leased 260 acres in Louisa County. (PTX 301.) The initial cost to Grace was $615,800. Grace also had to pay $56,000 in annual advanced mineral royalties under the Nininger and Brandy leases. (PTX 301.)

83. The South Carolina operations, now known as VVL's CVC division, were established in 1983. (PTX 307.)

84. The Hills ultimately notified Grace that its maintenance duties under the Brandy Agreement would be triggered on October 1, 1984. (Stip.¶ 45.)

85. Reluctant to assume the added costs of those responsibilities, Grace agreed with Brandy Farm, Ltd. (to which the Brandy properties since had been conveyed) to modify the agreement, to permit Brandy Farm, Ltd. to lease the Brandy Farm in its entirety to third parties. (Stip.¶ 46.)

86. In 1986, Grace perceived itself as "dominat[ing] the North American market," producing 72% (249,200 of 343,800 tons) of vermiculite consumed in North America. (PTX 307 at G002406, G002410). Grace estimated that Palabora produced 13% (44,000 tons) of vermiculite consumed in North America, and that VVL also produced 13% (12% (42,600 tons) at its Virginia division, and 1% (5,000 tons) at its South Carolina division (CVC)). (PTX 307 at G002406.)

87. Although in 1986 Grace believed that "[t]he ability of new competitors to enter the vermiculite market [was] severely hampered by limited access to commercial vermiculite deposits, capital requirements, the economies of scale developed by existing producers and, limited access to distribution," (PTX 307 at G002440), Grace also recognized VVL's fledgling South Carolina division as "a potentially significant new competitor." (PTX 307 at G002434.)

88. Grace initially purchased the properties in and around the District in the 1970s with the intent to mine them, but ultimately retained the properties for about twenty years without ever mining in Virginia.

89. The reason Grace retained the Louisa County reserves for twenty years without mining them, and yet continued to pay advanced mineral royalties, was to keep those reserves from its competitor, VVL. Internal Grace memoranda confirm that this was Grace's "strategy." (PTX

321. *See also* PTX 312 at 010448 ("[Grace] has continued to pay advanced mineral royalties to maintain mining rights, although at this time, it is primarily a defensive measure serving to keep Virginia Vermiculite from securing these reserves."); DTX 138 (stating that the "one benefit" gained from retaining the properties "is that Virginia Vermiculite is kept from acquiring these reserves").)

90. In late 1990, Grace closed its operations in Montana, as well as several of its exfoliating plants. (DTX 95 at 2.)

91. In December 1990, Ned Gumble, the manager of VVL's Louisa County plant, informed Gregory E. Poling, then the general manager of Grace's Specialty Vermiculite Unit in Grace's Construction Products Division, that VVL was interested in acquiring Grace's Virginia reserves. (Stip. ¶ 60; DTX 138.) VVL had mined the Purcell property extensively, and needed an additional source of supply to continue its operations in Virginia. (PTX 68, 78; DTX 138.)

92. Mr. Gumble's proposal gave Grace the opportunity to reevaluate its position in Virginia, as well as the costs and benefits of retaining the Louisa County properties without mining them.

93. Grace assessed several problems with its strategy of holding onto reserves to keep them from VVL. (DTX 138; PTX 321.)

94. One of the problems was that retaining the properties without mining them carried costs, such as advanced royalty payments, property taxes, and other expenses. (PTX 321; DTX 138.) As of December 1990, Grace had paid over $1 million in advanced royalties, and estimated it would have to pay at least another $1 million in advanced royalties over the next twenty years. (PTX 301.)

95. Another problem with this strategy was that simply holding onto the properties without mining them did not bring any income to Grace. In the early 1990s, Grace estimated that it would not be profitable to expend the up-front capital required to build a mill and to begin mining operations in Virginia, because the cost would exceed the cash flow from such operations. (PTX 318, 321, 323.)

96. Another problem was adverse publicity, due to HGSI's opposition to mining. (PTX 321.)

97. In addition, the original reason Grace acquired the reserves—to support a number of core businesses that were dependent upon vermiculite—no longer applied. Grace's core businesses no longer relied on vermiculite, and Grace did not think it ever would mine in Virginia. (DTX 138; PTX 321.)

98. Given all of these considerations, it became clear to Grace that the only benefit of retaining the reserves was to keep VVL from acquiring them. (DTX 138; PTX 321.)

99. On February 14, 1991, Mr. Poling wrote to his superiors, evaluating these various considerations. (DTX 138.)

100. Mr. Poling was aware at this time that VVL was running out of reserves in Louisa County. He viewed the strategy of keeping Grace's reserves from VVL as benefitting Grace because VVL "could be forced to cease operations" in Virginia if VVL did not obtain additional Virginia reserves. (DTX 138 at G003119.)

101. However, Mr. Poling did not think that keeping the reserves from VVL would help Grace create a monopoly in the North American vermiculite industry, because he saw vermiculite as remaining "readily available to the marketplace from Virginia's sister company Carolina Vermiculite as well as from Palabora and increasingly

from 'new' sources such as China, Brazil, Dillon [Montana], and others." (DTX 138 at G003120–21.)

102. Because Grace had not yet decided how, or whether, to dispose of its Louisa County properties, Mr. Poling advised that Grace further explore Mr. Gumble's proposal. (DTX 138.)

103. Grace and VVL had three meetings to discuss VVL's possible acquisition of Grace's Virginia reserves.

104. The first meeting between Grace and VVL took place on April 25, 1991, at VVL's Purcell property. (Tr. at 307.) Present for VVL were Mr. Gumble, Robert L. Sansom, Ph.D. ("Dr. Sansom"), VVL's general partner, and Dr. Sansom's brother, John C. Sansom, who managed VVL's South Carolina operations. Present for Grace were Mr. Poling and Grace's Manager of Strategic Planning, Michelle Stecyk. (Tr. at 307; PTX 76 at G015571.)

105. At the first meeting, Grace and VVL discussed four options: (1) Grace selling its Louisa County reserves to VVL; (2) Grace leasing or licensing its Louisa County reserves to VVL; (3) combining the vermiculite businesses of both companies into a separate entity; or (4) "doing nothing," which meant that Grace would continue to hold its Louisa County reserves, and VVL would continue to mine its existing reserves. (DTX 2, 134; PTX 70.)

106. Dr. Sansom offered to buy all of Grace's Louisa County reserves for $1.5 million. When the Grace representatives asked if his offer took account of the real estate value of the land, Dr. Sansom acknowledged that it did not, and changed his offer to $1.75 million for the land and the reserves.

107. Grace said it would take the offer under advisement and would schedule a follow-up meeting in June. (DTX 134; PTX 70.) At that time, Grace was assessing its options, but had not yet decided what to do with its properties.

108. In May 1991, before VVL and Grace had their second meeting, Ms. Ely of HGSI went to a Grace shareholder meeting in South Carolina. (Tr. at 1695–99; PTX 470.) At the meeting, Ms. Ely spoke with Grace's chairman, J. Peter Grace, and asked him to consider donating Grace's Louisa County reserves to HGSI. (Tr. at 1695.) Mr. Grace referred her to Grace's Executive Vice President, Donald Kohnken. (Tr. at 1695.)

109. Mr. Kohnken apparently did not know Ms. Ely and was not aware of Grace's activities in Louisa County. (Tr. at 1695, 1699.) He told Ms. Ely that Grace would contact her after it had considered the matter more fully. (Tr. at 1699.)

110. Mr. Kohnken subsequently asked Mario Favorito, Grace's in-house counsel, to advise him on the matter. (PTX 470.)

111. Mr. Favorito responded by an internal memorandum dated May 24, 1991. It is clear from the memorandum that Mr. Favorito had not thought about the mining situation in Louisa County for some time. He opined, based on his experience with Ms. Ely in the 1970s, that Ms. Ely still wanted Grace not to mine its reserves and, instead, wanted the company to donate its land for preservation and tax purposes. He made tentative recommendations, such as "politely declin[ing] any invitation to place preservation easements on the Green Springs property at this time." Mr. Favorito also attached a memorandum from Mr. Poling that indicated VVL was interested in acquiring the right to mine Grace's reserves. (PTX 471.)

112. It appears that it was by Mr. Favorito's memorandum that Grace's principal decision-makers—who included Mr.

Grace; J.P. Bolduc, Grace's President; Robert C. Walsh, a senior Grace officer; and Mr. Kohnken—first were made aware that VVL and HGSI were seeking simultaneously to obtain Grace's Louisa County reserves.

113. In June 1991, Mr. Poling drafted an internal memorandum assessing the costs and benefits of the four options he discussed with VVL at the first meeting. (PTX 303.)

114. Mr. Poling viewed the first option—selling to VVL—as having the benefit of eliminating Grace's carrying costs and generating immediate cash for Grace. Mr. Poling estimated that if the reserves and properties were sold for $2.2 to 3 million, Grace's after-tax income would be $1 to $1.4 million. Mr. Poling saw the obvious disadvantage of this option: It would "provide[ ] [Grace's] competitor with [a] reserve base." (PTX 303 at 010427.)

115. Mr. Poling viewed the second option—leasing to VVL—as having the advantages of providing Grace with an annual income stream and allowing it to retain ownership over the reserves, but the risk that Grace would assume liability for VVL's mining activities. (PTX 303 at 010427.)

116. Mr. Poling viewed the third option—combining the two companies' vermiculite businesses—as having the advantage of maximizing Grace's vermiculite assets, but the disadvantages of being complicated, having a low likelihood of success, and carrying antitrust risks. (PTX 303 at 010427.)

117. Mr. Poling viewed the fourth option—"doing nothing"—as having the advantage of "effectively removing these reserves from the system," (DTX 138 at G003121), thereby "keep[ing] Virginia Vermiculite from gaining needed reserves," (PTX 303 at 010427), but the disadvantage

of not maximizing the value of the property, since Grace most likely would not mine it. (PTX 303 at 010427.) To assess the viability of this option, Mr. Poling estimated that Grace would gain up to $1.5 million in business, over twenty years, if VVL ran out of reserves in Louisa County by 1995. (PTX 303 at G010432.)

118. However, Mr. Poling did not at this time think that *not* selling or leasing to VVL would limit VVL's access to reserves in the short term, because VVL had access to ample reserves in South Carolina. Mr. Poling viewed VVL as "under capacity" in South Carolina. (DTX 135; Poling Dep. (Nov. 20, 1997) at 373–78.)

119. Mr. Poling recommended that Grace pursue the first option, selling to VVL. He estimated the value of Grace's reserves to be $2 to 3 million. (PTX 303 at 01427, 01429.)

120. Mr. Poling's memorandum did not address what had become, since the first meeting, a fifth option: donating the properties to HGSI.

121. The second meeting between Grace and VVL took place at Grace's headquarters in Cambridge, Massachusetts, on July 8, 1991. Present for VVL were Dr. Sansom and Mr. Gumble. Present for Grace were Messrs. Poling and Favorito, and Ms. Stecyk. (Tr. at 613.) The parties again discussed the four options raised at the first meeting and addressed by Mr. Poling's memorandum. (Tr. at 613–31.) Grace indicated it was not interested in leasing reserves to VVL or in creating a joint venture with VVL, leaving the only remaining options as "sell to VVL" or "do nothing." (PTX 305; Tr. at 616, 622.) Mr. Poling also mentioned to VVL that Ms. Ely had approached Grace with another option, namely, that Grace donate its properties to HGSI. (PTX 305; Tr. at 615.)

122. As the second meeting was drawing to a close, the Grace representatives handed Dr. Sansom and Mr. Gumble a letter detailing Grace's counter-offer. (DTX 3; Tr. at 628.) Essentially the letter said that Grace would consider selling VVL the mining rights to Grace's Louisa County properties for $2.1 million, and the land itself for its appraised value. (DTX 3.)

123. At this time, Grace calculated the total amount of acreage it owned to be 1076 acres, (DTX 3), and estimated the market value of the land to be approximately $1000 per acre. (PTX 312 at 010439.) Therefore, the total market value of Grace's Louisa County real estate, independent of mining rights, was approximately $1 million. (PTX 77 at G15818.)

124. The parties considered Grace's total counter-offer to be $3 to 3.5 million for the land and the reserves, (Tr. at 638; DTX 137; PTX 71), as compared to Dr. Sansom's original offer of $1.75 million.

125. After the second meeting, VVL and Grace entered into a confidentiality agreement ("Confidentiality Agreement") so that VVL could view Grace's mining leases and other relevant documents, to make an informed counter-offer. (DTX 4, PTX 72.)

126. The fact that Grace allowed VVL to inspect Grace's confidential documents indicates that Grace was pursuing the negotiations in good faith.

127. Dr. Sansom attempted to calculate the value of Grace's holdings—and an appropriate response to Grace's counter-offer—based on the information he received pursuant to the Confidentiality Agreement. (Tr. at 632–38.)

128. The third and final meeting between Grace and VVL took place in Cambridge, on September 17, 1991. Present for VVL was Dr. Sansom. Again present for Grace were Messrs. Poling and Favorito, and Ms. Stecyk. (Tr. at 631, 639, 641.)

129. Having seen Grace's leases and, in light of his revised calculations, Dr. Sansom again offered Grace a total of $1.75 million to purchase Grace's Virginia mining rights and land. (Tr. at 641–42.) Although VVL was willing to pay up to $2.2 million, Dr. Sansom understandably did not communicate this amount to Grace. (Tr. at 643.)

130. The Grace representatives were non-responsive. Based on their demeanor at the meeting, Dr. Sansom suspected that Grace was negotiating with VVL simply to set a value on the properties for the purpose of determining the deductibility of a donation to HGSI, and that Grace at this time was not genuinely interested in reaching a negotiated agreement with VVL. (Tr. at 639, 641.)

131. While the court does not doubt the sincerity of Dr. Sansom's belief, objective evidence indicates that selling to VVL remained a possible option for Grace through July 1992, and that Grace had not yet decided whether to donate its properties to HGSI. (*E.g.,* PTX 312.) Moreover, no evidence was presented that Ms. Ely or HGSI had any influence or effect on what, during this period of time, appears to have been an entirely internal assessment by Grace of its various options.

132. The Grace representatives' non-responsiveness likely was due, instead, to their perception that Dr. Sansom's newest offer of $1.75 million was even less than his original offer of $1.75 million, because Dr. Sansom added conditions to his new offer that made it less attractive than the original offer. (DTX 133, 137; PTX 14 at 14379, 312 at 010439, 323; Bettacchi Dep. (Dec. 3, 1997) at 116.) For example, Dr. Sansom indicated that he wanted the pur-

chase price to be reduced by $350,000—to $1.4 million—if VVL was unable to obtain a conditional use permit to mine the properties within twelve months. (DTX 137; Tr. at 638–39.)

133. Grace interpreted Dr. Sansom's newest offer to indicate that VVL was unable or unwilling to increase its offer above $1.75 million. Grace accordingly decided further negotiations would not be productive. (DTX 7, 137.)

134. Dr. Sansom's firm negotiating position was the principal cause of the failed negotiations between Grace and VVL.

135. The negotiations with Grace having proved unsuccessful, VVL decided to attempt to acquire reserves from other sources.

136. In 1991, of the vermiculite concentrate sold in North America, Grace sold approximately 47% (86,157 tons), VVL sold 30% (17% (30,423 tons) from its Virginia division, and 13% (23,432 tons) from its South Carolina division), and foreign imports accounted for approximately 23% (40,783 tons). (Table 1.)

137. As of January 1992, Grace had not yet decided how to dispose of its Louisa County properties. A report dated January 13, 1992, reevaluated Grace's estimates of the Nininger reserves, and attempted to verify the accuracy of Grace's twenty-year-old reserve data. (PTX 306.)

138. On April 25, 1992, VVL leased Brandy B from Brandy, Ltd. (Stip.¶ 63.)

139. VVL could not begin mining Brandy B until it acquired a permit to do so from the Louisa County Board of Supervisors. (Stip.¶ 64.)

140. In May 1992, Ms. Ely attended Grace's annual shareholder meeting in Florida. (Stip.¶ 65.)

141. No evidence was presented that Ms. Ely communicated with Grace between May 1991 and May 1992, and Ms. Ely denied having done so. (Tr. at 1699.)

142. At the shareholders meeting, Ms. Ely met with Mr. Kohnken, among others, and attempted to persuade Grace to abandon any plans to mine in Louisa County. (Stip.¶ 66.)

143. Mr. Kohnken charged Mr. Walsh, a senior Grace officer, with the responsibility of developing a response to Ms. Ely. (Stip.¶ 67.)

144. This appears to have been Ms. Ely's first indication that Grace, after two decades, finally may have been interested in pursuing a donation.

145. Ms. Ely had developed an "intense interest" in the vermiculite industry since the 1970s. (Ely dep. (Apr. 14, 1999) at 430.) She became extremely knowledgeable about the geography and history of the Louisa County area; the vermiculite industry; how to lobby politicians in the local, state, and federal governments; which mining companies owned what properties; which properties did or did not have conservation easements; when the companies were applying for rezoning permits; and when certain properties were, or were about to be, transferred to a mining company. (*E.g.*, PTX 120 at H0046, 441; Tr. at 1646–95; 1743; 1799–1804.)

146. Ms. Ely's intense interest in and knowledge of the vermiculite industry and Louisa County affairs raise the inference that, at least by May 1992, Ms. Ely realized VVL only controlled the Purcell reserves and had leased the Brandy B property to replenish its depleting reserves.

147. The conjunction of VVL's depleting reserve situation with Grace's newfound interest in donating its properties presented, for the first time, the real possibility that Grace would leave Virginia and that VVL could run out of reserves in Virginia.

148. Because of these unusual circumstances, a well-timed donation could fulfill what Ms. Ely testified had been her goal "since October ... 1972," namely, the elimination of all vermiculite mining in Virginia. (Tr. at 1897.)

149. To take advantage of this opportunity, Ms. Ely began to take control of the HGSI organization.

150. Ms. Ely called an HGSI board meeting on June 11, 1992. She reported that VVL was planning to expand its operations, and that HGSI's goal should be "to get rid of all vermiculite mining." Ms. Ely also said she was ready to assume the presidency of HGSI. (PTX 94.)

151. Except in one instance, Ms. Ely was the only HGSI member to communicate with Grace. (Tr. at 1571–74.)

152. Some of the members began to express dissent that the organization was being dominated by Ms. Ely, was dividing into factions, and was operating in too much secrecy. (PTX 96.)

153. On June 26, 1992, Ms. Ely was elected President of HGSI, with Roberta W. Patton as Vice–President.

154. In the fall of 1992, over a dozen HGSI members wrote a letter to Ms. Ely, objecting that she operated the organization in "an increasingly undemocratic" manner. (PTX 121.) Ultimately, Ms. Ely effectuated the dissolution of HGSI's membership, and the members were limited to HGSI's five–member board of directors. The board, which Ms. Ely headed, was to be "self-perpetuating." (PTX 107.)

155. As of mid–1992, Grace still had not decided how to dispose of its property. (PTX 312; DTX 133.)

156. On July 29, 1992, Mr. Poling prepared charts summarizing the options Grace was considering at that time. Those options included: (1) selling the properties for a non-mining use (thus maintaining the mineral rights) to potential buyers, such as private parties, Ms. Ely or HGSI, the National Park Service, or "Shenandoah Crossing," a time share development abutting the Grace properties; (2) donating the land to HGSI, thus receiving a charitable donation tax treatment; and (3) selling or leasing the reserves to VVL. (PTX 312 at 010439, 010450.)

157. Grace viewed the first two options as more viable than the third, as Mr. Poling's charts qualified the third option by the statement, "Discussions were held with Virginia Vermiculite in the summer of 1991 and terminated in September when they added conditions to their initial $1.75 million offer, effectively reducing the deal to an unacceptable level." (PTX 138 at 010439. *See also id.* at 010450 (listing VVL as a potential buyer, but noting that "[p]revious negotiations terminated September 1991").)

158. Grace was aware that VVL was running out of reserves, (PTX 312 at 010439), and "expected [VVL] to exit the market due to a shortage of reserves, [although] ongoing efforts to find reserves may extend [its] capability for several years." (PTX 76 at G015522.)

159. However, Grace also considered the vermiculite industry to be in an "over-capacity situation," and was concerned that "potential new suppliers ... will only ... continue the downward price pressure on VCX," Grace's vermiculite concentrate product. (PTX 76 at G015518.)

160. As of July 1992, Grace viewed itself as having a "strong yet declining share of the vermiculite concentrate market," (PTX 76 at G015512), and it perceived Palabora as being "the largest and most profitable vermiculite producer," that "dominat[ed] the industry" with its "'benchmark' product quality," "full range of concentrate sizes," "full product line,"

"excellent yields," and "high purity." (PTX 76 at G015524–25.) Although Palabora had nearly twice Grace's costs, due to transatlantic shipping costs, Grace estimated that Palabora's gross profit was over twelve times greater than Grace's gross profit. (PTX 76 at G015523.)

161. In his July 29, 1992 charts, Mr. Poling recommended that Grace sell the real estate of its owned properties, but retain the mining rights, in order to "reduce[ ] capital," to "provide[ ] income/cash flow from the sale," and to "maintain[ ] [Grace's] defensive competitive posture." As for the leased properties, Mr. Poling recommended that Grace "[c]ontinue to pay minimum royalties for two (2) years . . . to allow time to assess Virginia Vermiculite's ability to continue to operate." (DTX 133 at G003189; PTX 312 at 0104340 (emphasis added).)

162. Mr. Poling's July 1992 recommendation differed from his June 1991 recommendation (*i.e.*, to sell to VVL), in that he now was focused more definitely on maintaining a defensive posture with respect to Grace's reserve base. Further, he now perceived VVL's ability to operate as being relevant to Grace's ability to maintain that defensive posture.

163. In August 1992, Mr. Walsh inquired of Mr. Poling how much Grace's vermiculite business would benefit from VVL closing in Virginia due to a lack of reserves. Consistent with his June 1991 memorandum, Mr. Poling responded that Grace's business would benefit by a net present value of $1.5 million. Mr. Walsh also asked how much VVL's vermiculite business would benefit if VVL obtained Grace's Virginia reserves. Mr. Poling responded that VVL likewise would benefit by $1.5 million. (PTX 313 at G003239; Walsh Dep. (Dec. 1, 1997) at 110–13; Walsh Dep. (Dec. 2, 1997) at 47–48.)

164. As of August 1992, Ms. Ely knew that VVL was applying for a permit to mine the Brandy B property, and was concerned that VVL would expand its operations across Route 22. (PTX 120.)

165. Ms. Ely previously had told Mr. Gumble that VVL could precipitate "World War III" if it crossed Route 22. Other landowners had described Route 22 as "the Maginot line." (Tr. 282.)

166. Mr. Walsh visited Louisa County on September 1 and 2, 1992. (PTX 320.) While there, he met with Ms. Ely and Ms. Patton of HGSI. He also met with Tyson Van Auken of the Virginia Outdoors Foundation, another local preservationist group, to discuss the practicalities of including conservation easements and restrictive covenants with a land donation. (PTX 320; Tr. at 1703–08.) Mr. Walsh and Ms. Ely had continued discussions thereafter. (PTX 320.)

167. At the September 1992 meeting, Ms. Ely raised the subject of VVL's pending application to mine Brandy B with Mr. Walsh. (Tr. at 1705.)

168. Mr. Van Auken testified that he did not recall discussing VVL at his meeting with Mr. Walsh; therefore, Mr. Van Auken either forgot the discussion, or Mr. Walsh and Ms. Ely discussed VVL outside of Mr. Van Auken's presence.

169. It was at this point—in September 1992—that Grace and HGSI decided that their common interest would be served by VVL going out of business in Virginia, and that this goal could be accomplished by Grace donating its properties to HGSI, with restrictive covenants that would prohibit any future mining.

170. Grace viewed donating to HGSI as a solution to the problems associated with its strategy of retaining the reserves to keep them from VVL. By donating to an anti-mining organization that would agree

to far-reaching restrictions on mining, Grace could eliminate its carrying costs and related expenses, and yet continue to prevent VVL from acquiring those reserves.

171. In notes dated September 1, 1992, Mr. Walsh described Grace's goals as follows:

1. Eliminate future outlays of $1.1 million
2. Maximize the benefits relating to past outlays
3. Keep Virginia Vermiculite from improving its competitive position
4. Cooperate with goals of Green Springs District.

(PTX 317.)

172. Mr. Walsh also wanted to find out "where . . . things stand on Virginia Vermiculite plans and Green Springs['s] attempts to stop Virginia." (PTX 317.) As these notes were written on September 1, he presumably was going to find out where those plans stood during his meeting with Ms. Ely the following day.

173. Ms. Ely denied that Mr. Walsh indicated a donation would serve to injure VVL. (Tr. at 1706.)

174. On September 9, 1992, Lee P. Hackett, who worked for an appraisal company, had a telephone conversation with Margaret Sheehan, one of Grace's tax attorneys with whom Mr. Walsh had been working, (PTX 321), in which Ms. Sheehan communicated that "Grace is considering a charitable donation, as long as there is some protective clause against allowing any Grace competitor, at any future time, to conduct mining operations." (PTX 450.)

175. Meanwhile, as noted *supra*, VVL was planning to apply for a permit to mine the Brandy B property. VVL realized it would have to transport any ore mined at Brandy B to be processed at the Purcell property. VVL was concerned that if it had to use trucks to transport the ore over the public road (Route 22), the disturbance might provide the Louisa County Board of Supervisors with a basis for denying its application. (PTX 14.)

176. On September 10, 1992, Mr. Gumble telephoned Mr. Poling. Perhaps unwisely, Mr. Gumble informed Mr. Poling of the above concerns and told him that VVL's permit more likely would be granted if it could transport the ore "off road." He therefore asked Mr. Poling whether Grace would consider building a road and bridge (across the South Anna River) on Grace's M.F. Peers River Property, and whether Grace would sell VVL an easement over the same. (PTX 14; Tr. at 356–59.)

177. Mr. Gumble's notes of his conversation with Mr. Poling indicate that Mr. Poling did not think Grace would agree to such an easement, and wondered why Grace would help its competitor. (PTX 14; Tr. at 195–96.)

178. In addition, Grace's plans with HGSI already were underway, so Grace no longer had any interest in selling its properties or any easements to VVL.

179. On September 17, 1992, Mr. Walsh wrote an internal memorandum to Mr. Kohnken, in which Mr. Walsh summarized his findings concerning Grace's properties in Louisa County. The memorandum provides considerable insight into Grace's intent and into its cooperation with HGSI in the months preceding the donations. In substantial part, the memorandum reads:

It is clear to me that it is extremely unlikely Grace will ever mine vermiculite in Virginia as the vermiculite business is less important strategically today, we have adequate reserves in South Carolina, and the economics of investing capital to develop a mining and milling

operation are poor. Yet to continue our strategy of keeping the reserves out of the hands of an adjacent competitor (desirable) involves future annual lease payments and taxes that cumulatively amount to about $1.1 million pre-tax over the next twenty years.

Rae Ely's pitch for twenty-years [sic] has been for Grace to donate its owned land and leased vermiculite rights to Green Springs Historical Inc. [sic] and take a charitable donation . . . .

With all of this in mind, I met with Rae Ely and other interested parties . . . .

In general, the results of that meeting are that the people I met with are quite interested in . . .

. . . [a]ccept[ing] ownership of our land . . . . [and]

. . . [a]ssum[ing] the obligations under our mineral lease agreements, including the future annual payments (thereby keeping the reserves off the market). . . .

Since my visit to Green Springs on September 1 and 2, I have been . . . continuing conversations with Rae Ely.

While this assessment of the situation has been going on, our competitor, Virginia Vermiculite, who mines on adjacent properties, has filed for new mining permits to open up some new reserves under lease to them. Rae Ely and friends are determined to take on Virginia Vermiculite in what she labels as "the war of all holy wars". Their war with Virginia Vermiculite and its owner, Robert Samson [sic], has been going on for years.

In the past few days, she informed me that her group has discovered the unreported use of some chemicals, the presence of some oil spills, and the washing out of drums on Virginia Vermiculite's property. She intends to bring the State down on them. . . . (In past conversations, she has talked about bringing the issue of asbestos contamination of vermiculite in Virginia into this arsenal of arguments. I think I have convinced her that is not a good idea.)

Since the hearing on the mining permit is scheduled for October 8, Ely and company plan to begin their "war" on Friday, September 25. She believes, as I do, that Grace will benefit from an announcement a couple days ahead of their launching their fight and could come out less positively by announcing after. . . .

I believe we should get the long-standing issue behind us, avoid the future expenses, and get the favorable P.R. value.

On the other hand, there are property owners who have vermiculite deposits who consider Ely to be a meddling devil. Also, Virginia Vermiculite may argue that Grace and [HGSI] have cooperated to their detriment. . . .

So, there is also the possibility of some adverse reaction. . . .

. . . Because of the new development at Virginia Vermiculite, I propose we proceed and make our announcement next week . . . .

(PTX 321.)

180. The next day, on September 18, 1992, Ms. Ely faxed Mr. Walsh a list of chemicals purportedly used in VVL's mining operations. (PTX 322, 349; Tr. at 2047–53.)

181. On cross-examination, Ms. Ely attempted to deny that she had done so, until it was pointed out that the facsimile date and time stamp on the top of her personalized cover sheet matched the date and time stamp on the top of the attached list of chemicals, which proves that HGSI

sent Mr. Walsh the list of chemicals on the date indicated. (Tr. at 2047–51.)

182. Ms. Ely faxed Mr. Walsh the list of chemicals to identify possible ways in which VVL might have violated environmental laws. (PTX 322, 349.) Ms. Patton of HGSI acknowledged on cross-examination that she "c[ould]n't think of any legitimate reason [HGSI] would be talking to Grace about environmental problems at Virginia Vermiculite's facility." (Tr. at 1613.)

183. During at least one of Mr. Walsh's conversations with Ms. Ely during this period, they discussed "coordinat[ing]" a "meticulous time line." (PTX 349; Walsh Dep. (Dec. 2, 1997) at 39–41.)

184. The timing of the donations was important to both Grace and HGSI, because both knew that VVL was running out of reserves, and hoped that the donations would prevent VVL from acquiring the reserves it needed to stay in business in Virginia.

185. Grace prepared a list of Louisa County landowners to contact prior to the making of the donations. The list included the M.F. Peerses, the A.D. Peerses, the Niningers, and Ann Hill Granger, the owner of the Brandy properties and daughter of the Hills. Grace noted that the Peerses were "entitled to royalties if [the property is] mined," and that the Niningers and Hills received annual advanced royalties. Grace recognized that because these individuals expected their properties to be mined, donating the properties to an anti-mining organization carried the potential disadvantage of "legal action." (PTX 351.)

186. In mid- to late September 1992, Mr. Poling called M.F. Peers to arrange for a tour of the M.F. Peers property, and M.F. Peers provided a tour to Mr. Poling and Ms. Stecyk. When M.F. Peers asked why they wanted a tour, Mr. Poling said that Grace was evaluating what to do with the property. M.F. Peers told him Grace either should mine it or sell it to someone who would mine it. (Tr. at 538–39.)

187. Mr. Poling told M.F. Peers that he thought the property might be mined, (Tr. at 538), and did not mention that Grace was planning to donate the property to HGSI. (Tr. at 539.)

188. Before the donations were announced, Grace knew that donating the properties to HGSI would foreclose the possibility that the properties would be mined, and that, therefore, the donations would harm property owners such as the Peerses, to whom Grace had promised "per ton" mining royalties.

189. Ms. Ely also knew that the donations would harm property owners such as the Peerses. Grace sent Ms. Ely copies of its lease and mining agreements with the various Louisa County landowners on September 23, 1992. (PTX 324.) Ms. Ely admitted on cross-examination that she "knew that [the M.F. Peerses] had a financial interest in having their former property mined," (Tr. at 2077); that imposing restrictive covenants not to mine was more injurious to the Peerses than if Grace simply retained the properties without mining them, as the restrictive covenants prevented the properties from being mined, (Tr. at 2078); and that she was sure the Peerses were "very unhappy" when they learned about the donations to HGSI. (Tr. at 2073.)

190. On September 28, 1992, Ms. Ely wrote to Mr. Walsh. In her letter, she emphasized that "[t]he long-term successful accomplishment of our joint and several goals is most probably met by maintaining the Grace/HGSI cooperative undertaking." She stated that "[a]ny control put in the hands of third parties with unknown agendas will at best dilute and at worst defeat the original objectives," and recommended that any third parties be informed "that a

full agreement with HGSI was reached 7 to 10 days ago." (PTX 326.)

191. The only "joint" goal that Grace and HGSI shared was VVL going out of business in Virginia.

192. At trial, Ms. Ely attempted to explain that she wrote the letter because she apparently received a call from someone in the office of the Governor of Virginia who said that the Governor called Mr. Bolduc to request that Grace not make the donation to HGSI. Ms. Ely testified that this was "one of the most surprising and ... upsetting phone calls ... [she had] ever received," but, incredibly, that she could not remember the name of the person who called her. (Tr. at 1744.)

193. At 8:00 a.m. on September 29, 1992, Mr. Poling unexpectedly called M.F. Peers, and said he was coming to the M.F. Peerses' residence. (Tr. at 542–43.)

194. Mr. Poling arrived, showed the M.F. Peerses a press release, and informed them that Grace was announcing a donation of all its Louisa County land to HGSI.

195. M.F. Peers and his wife were upset that the properties were being donated to HGSI, because they never had been paid royalties for their vermiculite. (Tr. at 543.)

196. Mrs. Peers "jumped up and down and said that was the lowest thing she had ever heard of." (Tr. at 543.)

197. Later that day, Grace issued a press release announcing it was donating all of its Louisa County interests to HGSI. (Stip. ¶ 68; PTX 327.)

198. In 1992, before its donations to HGSI, Grace controlled (either by lease or ownership) reserves in Louisa County that it estimated to be equal to 1,520,000 tons of vermiculite concentrates. (Stip.¶ 19.)

199. In early October 1992, VVL made a presentation at a Louisa County Planning Commission meeting concerning VVL's application for a permit to mine the Brandy B property. At the meeting, Mr. Gumble and Dr. Sansom made clear that VVL needed to mine the Brandy property to stay in business in Virginia, due to the depletion of the Purcell reserves. Ms. Ely was present at the meeting, and therefore, was aware of VVL's depleting reserve situation, at the latest, by this date. (PTX 68, 78; Cf. Tr. at 2010.)

200. Pursuant to a provision in the original 1973 Agreement between the A.D. Peerses and Grace, the A.D. Peerses had the option of buying back the 37–acre Parcel A in the event that Grace "resold" the property. (Stip.¶ 88.)

201. On October 16, 1992, the A.D. Peerses wrote to Grace, stating that because Grace was not going to mine the property, they wished to exercise their right to buy back Parcel A. (PTX 330.)

202. The A.D. Peerses sought to buy back Parcel A to sell or lease it to a third party that would mine it, so that they could receive mining royalties.

203. On October 27, 1992, Grace responded, assuring the A.D. Peerses that it had not yet finalized plans to donate their properties to HGSI. Grace informed them that they therefore could not yet buy back Parcel A. (PTX 329, 332.)

204. Contrary to its representations to the A.D. Peerses, Grace already had decided by this time to donate the A.D. Peers properties to HGSI, and to include restrictive covenants not to mine in the deeds of gift; Grace's press release spoke of Grace's intent to donate all of its interests in Louisa County, and the original drafts of the 1992 donation deeds included the A.D. Peers properties among the donations

subject to the written restrictive covenants. (Stip.¶ 93.)

205. It was only after receiving the A.D. Peerses' October 27 letter that Grace was reminded of the buy-back provision, and made aware that donating the A.D. Peers properties to HGSI could result in VVL obtaining Parcel A.

206. On November 10, 1992, Mr. Walsh wrote an internal memorandum to Mr. Poling, suggesting that Grace and HGSI enter into an understanding to withhold the A.D. Peers donation, as a delay might prevent VVL from replenishing its depleting reserves. (PTX 331.)

207. Grace was concerned that if it donated the A.D. Peers property to HGSI, the donation might constitute a "sale," giving A.D. Peers the option of buying back Parcel A. Grace and HGSI, as evidenced by HGSI's ultimate agreement to delay the donation, were aware that VVL was depleting its reserves; that Parcel A might contain up to 250,000 tons of vermiculite; that A.D. Peers likely would sell Parcel A to VVL; and that if VVL obtained Parcel A it could continue mining in Virginia for an additional five to six years. (PTX 331, 402.)

208. Therefore, Grace and HGSI entered into an understanding to delay the A.D. Peers donation, pending the outcome of the Brandy permitting process. Grace and HGSI thought that if the Brandy B permit restricted the amount of reserves that could be mined, a multi-year delay of the A.D. Peers donation could assure that VVL not mine Parcel A, and thus, could lead to VVL going out of business in Virginia. On the other hand, Grace and HGSI thought that if the Brandy B permit did not restrict the amount of reserves that could be mined, a multi-year delay would not be helpful because VVL would remain in business in Virginia even if it did not obtain Parcel A. (PTX 331.)

209. Ms. Ely denied that she intended the delay to injure VVL. (Tr. at 1765.)

210. On November 13, 1992, A.D. Peers wrote a letter to Grace, expressing relief at Grace's assurances that it had not yet had definitive discussions with HGSI about the donations. Grace decided not to respond to A.D. Peers until it determined whether VVL's Brandy B permit carried enough restrictions to make a delay of the A.D. Peers donation worthwhile. (PTX 332.)

211. On November 18, 1992, Ms. Ely wrote to Mr. Favorito saying it would be in "everyone's interest" if Grace conveyed the M.F. Peers River Property and the Brandy properties to HGSI prior to the hearing, "since doing so will produce the maximum benefit." (PTX 431.)

212. The court finds Ms. Ely's reference to Grace and HGSI sharing an interest to be probative of their joint intent that VVL deplete its reserves in Virginia.

213. Ms. Ely testified, remarkably, that, in using the phrase, "everyone's interest," she did not mean to include Grace in the term "everyone," even though Grace was the party to whom she addressed the letter. (Tr. at 2068.)

214. On November 30, 1992, Grace began transferring its Louisa County properties to HGSI, with the exception of the A.D. Peers property. (Stip.¶ 69.)

215. On that date, Grace conveyed two properties to HGSI by a single quit claim deed of gift. (Stip.¶ 70.) One of those properties was M.F. Peers Parcel II, the River Property located between VVL's Purcell and Brandy B properties.

216. Around the same time, VVL was scheduled to appear at a hearing on its application for a permit to mine Brandy B.

(Stip.¶ 71.)[1]

217. Grace donated the M.F. Peers properties to HGSI in furtherance of its own interest, and with intentional disregard of the financial interest of the M.F. Peerses.

218. The November 30, 1992 deed contained the following restrictive covenants:

1. No part of the Real Estate shall ever be used or operated for the purpose of Mining or Mineral Production. The phrase "Mining or Mineral Production," as used herein, shall include, but shall not be limited to, the following:

   a. The extraction, removal or relocation of ores, minerals, stone, gravel and soils (including, but not limited to, vermiculite), regardless of whether or not such material is under, on or above the surface of the Real Estate;

   b. Auger mining, underground mining, strip mining, open pit mining, quarrying, blasting, digging, hydraulic mining, dredging, tunnel mining, deep mining, surface [sic] mining, placer mining, longwall mining, and any other method of mining not mentioned herein which has been practiced, which is currently practiced or which may be practiced at any time in the future.

2. The Restrictive Covenants shall apply notwithstanding any attempt, whether successful or not, at restoration of the Real Estate through the process of reclamation or any other method which restores the Real Estate to the state in which it existed prior to Mining or Mineral Production.

3. No excavation or grading may be made on the Real Estate except for walls, footings, basements, or cellars which such excavation or grading shall be solely incidental to the erection and construction of residential and agricultural structures on the Real Estate.

4. The Real Estate shall be used solely for agricultural and residential purposes. Digging or plowing incidental only to residential or agricultural purposes shall be permitted.

5. Grantor [Grace] covenants and agrees, for itself, its successors in title and interest, and its assigns, that the Restrictive Covenants shall run with the land forever.

(PTX 53; Stip. ¶ 72.)

219. These restrictive covenants were included on all of the donated properties, and similar provisions were included in the assignments of Grace's leases. These covenants had the purpose of preventing VVL from mining the properties and from using the properties to transport its vermiculite ore, in the event that VVL ever found itself in a position to do so.

220. For example, in prohibiting "[t]he extraction, removal or relocation of ores, minerals, stone, gravel and soils (including, but not limited to, vermiculite), regardless of whether or not such material is under, on or above the surface" of the M.F. Peers

---

1. The court includes this as a finding of fact only because the parties stipulated to it as such. However, the only inference to be drawn from this fact is that HGSI and Grace, in concert, timed the donation to give HGSI greater standing to oppose VVL's Brandy B permit at the Louisa County Board of Supervisors meeting in December 1992 (as indicated in PTX 333). The court does not herein draw that inference or otherwise rely on this stipulated fact, because even "an 'anticompetitive purpose [does] not illegalize' concerted attempts to influence public officials." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 398 (4th Cir.2001) (quoting *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)).

River Property, Grace and HGSI intended to prevent the transportation of any vermiculite across the property, whether the vermiculite was mined from within or without the property. In particular, Grace and HGSI intended to prevent VVL from ever transporting the vermiculite VVL eventually would mine at Brandy B across the M.F. Peers property to VVL's mill at the Purcell property.

221. Ultimately, however, the restrictive covenants were not a material cause of VVL not being able to transport ore across the M.F. Peers property, because it was not proven that Grace or HGSI would have allowed such transportation even if there were no restrictive covenants on the M.F. Peers property.

222. Nor was it proven that Grace would have sold its Virginia reserves to VVL, even if Grace ultimately had not donated the properties to HGSI with the covenants not to mine. Although Grace initially considered selling its properties to VVL, such a sale was simply one of several tentative options Grace was evaluating to determine whether to dispose of its properties. (DTX 2, 134; PTX 70, PTX 312 at 010439, 010450.) At no point did Grace ever commit to selling to VVL. But for the donations to HGSI, Grace would have been in the position it was in before it decided to make the donations. A preponderance of the evidence did not establish that Grace would have chosen the option of selling to VVL over the other possible options. In fact, there is evidence that suggests Grace would *not* have sold to VVL if donating to HGSI had not been an option. For example, while selling to VVL would have brought Grace immediate income and cash flow, Grace had other interests besides immediate income and cash flow; it was interested in sustaining the viability of its own vermiculite business, keeping VVL from reserves, and enhancing its public image, none of which could be accomplished by selling its reserves to VVL. Moreover, Grace was cognizant of the obvious business disadvantages of selling its reserves to one of its principal competitors. (*E.g.*, DTX 135, 138; PTX 14, 312.)

223. On December 2, 1992, Mr. Poling wrote to M.F. Peers, ostensibly to keep him informed of the donations. Although the M.F. Peers River Property already had been transferred to HGSI, Mr. Poling told M.F. Peers that Grace was intending to transfer the River Property "this week." (PTX 43.)

224. On December 7, 1992, the Louisa County Board of Supervisors convened a hearing on VVL's application for a conditional use permit to mine Brandy B. (DTX 9.)

225. Ms. Ely was present at that hearing. (Stip. ¶ 73; DTX 9 at 15.)

226. The Board of Supervisors staff report recommended approving the permit, commenting that the proposed use was allowable in an industrial district, and that the public health and safety would be maintained by the conditions of the permit and by the requirements of state and federal regulatory agencies. (DTX 9 at 15.)

227. Ms. Ann Hill Granger spoke in support of the permit. She said she was a preservationist, but that vermiculite was similar to a crop raised on any other farm. (DTX 9 at 16.)

228. Dr. Sansom and Mr. Gumble also spoke in favor of the permit, explaining VVL's mining operations and the commercial benefits of vermiculite. Mr. Gumble said VVL would use trucks to transport the ore mined at Brandy to the processing mill at Purcell, along a one-half mile stretch of Route 22. (DTX 9 at 15–16.)

229. Ms. Patton spoke against the permit, citing concern about the monitoring of

chemicals and contaminants in the ground and water.

230. Ms. Ely also spoke against the permit, saying she thought VVL had not complied with its original conditional use permit for the Purcell property. Ms. Ely requested that the Board of Supervisors conduct traffic and groundwater studies before it made any decision. She also "urged the Board to require a shuttle lane from the [Brandy] property to the Purcell property." By a "shuttle lane," Ms. Ely meant some type of off-road transportation route. (DTX 9 at 21.)

231. From Ms. Ely's request that the permit be conditioned on the availability of a shuttle lane, an inference is raised that Ms. Ely made such a request because, as the owner of the intervening M.F. Peers River Property, she thought she could prevent a shuttle lane from being built.

232. The Board of Supervisors deferred its decision and asked Ms. Ely and VVL to negotiate towards keeping the truck traffic off of Route 22. (DTX 9 at 21.)

233. The next day, Dr. Sansom wrote to the Board of Supervisors stating that VVL was willing to engage in negotiations to secure an easement across the M.F. Peers River Property, to prevent on-road haul of the ore that would be mined at Brandy. Dr. Sansom noted that VVL probably would have to haul on Route 22 for a significant period in any event. He stated that even if such an easement were agreed to, crossing the South Anna River likely would require a permit from the U.S. Army Corps of Engineers, which regulates wetlands. Dr. Sansom indicated that the property owner, i.e. HGSI, would have to begin the process of obtaining such a permit, and that the permitting process could take up to a year to complete. Dr. Sansom concluded by saying that a prompt

decision by the Board of Supervisors was "essential to [VVL's] plans." (DTX 10.)

234. Dr. Sansom placed Mr. Gumble in charge of the negotiations for VVL, and instructed him to contact Ms. Ely. (DTX 10 at 2.)

235. On December 12, 1992, HGSI held a board meeting at which the members discussed receiving the River Property deed, and spent several hours reviewing the proposed deeds and lease assignments for the remaining properties. However, the issue of off-road transportation over the River Property was not discussed, which raises the inference that Ms. Ely did not inform the HGSI board of the Louisa County Board of Supervisors' request that HGSI negotiate with VVL. (PTX 101.)

236. On December 14, 1992, Mr. Gumble telephoned Ms. Ely to begin the negotiations. Ms. Ely told him she was going to be in New York, but to send VVL's off-road proposal for her review. (DTX 115.)

237. On December 15, 1992, Mr. Gumble promptly responded, outlining the major points he believed would be required to reach an agreement. Mr. Gumble proposed that VVL pay HGSI for a permanent easement, or purchase or rent the strip of property that would be involved; that VVL select the route; that HGSI support any other permit applications; and that VVL agree to appropriate reclamation provisions on the parcel. He also indicated that VVL had made preliminary investigations on the construction costs for a road and bridge, and on the delineation of wetlands and routes. (PTX 16.)

238. On December 16, 1992, the Louisa County Board of Supervisors wrote to Dr. Sansom, affirming it would consider his permit application at its meeting scheduled for January 4, 1993. (DTX 14.)

239. On December 21, 1992, Ms. Ely responded to Mr. Gumble's letter of De-

cember 15. Ms. Ely stated that before she could bring the matter to the attention of the HGSI board, she required more details concerning the specific structure and location of the off-road route, to assess the possible impact on HGSI's land. She also indicated that, as the lessee of Brandy A, HGSI had an interest in VVL's mining plans, to determine how those plans might affect Brandy A. (PTX 17; DTX 15.)

240. By quit claim deed of gift dated December 22, 1992, recorded December 23, 1992, Grace conveyed to HGSI its remaining Louisa County properties, with the exception of the A.D. Peers property. (Stip. ¶ 74; PTX 54.)

241. The donation of the A.D. Peers property was withheld pursuant to Grace's and HGSI's understanding to delay the donation, discussed *supra,* because the Board of Supervisors had not yet determined whether to grant VVL a permit to mine Brandy B, or whether such a permit, if granted, would limit the amount of reserves VVL could mine from that property.

242. Grace claimed a substantial income tax deduction for its 1992 donations to HGSI. (Stip. ¶ 78.)

243. All of the properties conveyed in December 1992 contained the same restrictive covenants quoted *supra.* (Stip. ¶ 75; PTX 54.)

244. Grace and HGSI hoped that by making the donated reserves unavailable for mining, VVL would deplete its reserves before it could acquire additional reserves, and thus, go out of business in Virginia.

245. It was not necessary for Grace to include restrictive covenants in order to donate to HGSI or to claim a tax deduction, as Ms. Ely conceded at trial. (Tr. at 1964–65.) The fact that the restrictive covenants were not required for tax purposes is otherwise apparent by Grace's

claiming a deduction for its donation of the A.D. Peers property to HGSI in 1994, although the donation deed for that property contained no written restrictive covenants. (Stip. ¶¶ 91, 92.)

246. The restrictive covenants agreed to by Grace and HGSI contained more detailed prohibitions against mining and transporting ore than conservation easements to which HGSI had agreed in the past. (*Compare* Stip. ¶ 72 *with* PTX 90, 91; DTX 33.) For example, the covenants prohibited mining even if the land could be successfully restored. (PTX 53.)

247. Ms. Ely conceded that she did not believe Grace was concerned about its standing among environmentalists. (Tr. at 1945.)

248. Some of the properties donated in 1992, such as the Lloyd I and Harris properties, are not located in the Landmark District. (Stip. ¶ 101.) The Lloyd I and Harris properties are known as the "railroad siding," and originally were purchased by Grace to facilitate the loading of vermiculite onto trains, for shipment out of Louisa County. (PTX 438, 471 at G63593.) Like the restrictive covenants on the M.F. Peers River Property, the Lloyd I and Harris properties prohibited the use of the land for the transportation of vermiculite. Grace and HGSI did not agree to include restrictive covenants on those properties in furtherance of any preservationist purpose; rather, the only reason the restrictive covenants were included on the Lloyd I and Harris properties was to prevent VVL from using those properties to transport its vermiculite, in the event that VVL ever found itself in a position to do so.

249. Also on December 22, 1992, by "Assignment and Acceptance Agreement," Grace assigned its Nininger and Brandy A leases to HGSI. (PTX 55, 56; Stip. ¶ 76.)

250. Each of those leases contained the following provision:

Assignor and Assignee acknowledge that the Agreement creates no obligation upon Assignor to mine the Premises. Assignee, by acceptance of this Assignment, agrees not to mine the Premises and shall exert reasonable efforts to prevent mining on the Premises during the term of the Leasehold Estate created by the Lease Document.

(PTX 55, 56; Stip. ¶ 77.)

251. HGSI paid advance royalty payments to the Niningers pursuant to the Nininger lease. (PTX 56, 131, 441, 442; cf. Stip. ¶ 96.)

252. It is not a common practice among preservationist groups to assume payment obligations under mining leases. (Tr. at 2126–27.)

253. The Nininger property was transferred only to further HGSI's and Grace's joint goal of preventing VVL from replenishing its depleting reserves; it was not transferred for any preservationist or other potentially legitimate reason.

254. On December 24, 1992, Mr. Gumble responded to Ms. Ely's December 21 letter. He stated that VVL was proposing to construct a road and bridge across the South Anna River, and clarified that the only structure would be a bridge. In response to Ms. Ely's comment about the use of Brandy A, Mr. Gumble said his understanding was that although Grace leased the mineral rights, Brandy, Ltd. continued to control the surface rights, and could use the surface in any manner it wished. Mr. Gumble offered to meet with Ms. Ely or the HGSI board to discuss VVL's proposal. (PTX 18.)

255. Ms. Ely responded to Mr. Gumble's letter on December 29, 1992. As in her December 21 letter, she informed Mr. Gumble that the HGSI board would not meet with him until he provided more details, ostensibly so that the meeting could be more productive. She added that the Hills had reserved no rights with respect to the Brandy A property, and warned that anyone who entered or used that property without HGSI's consent would be trespassing. (PTX 19; DTX 16.)

256. Ms. Ely knew that VVL would have to cross Brandy A, in addition to the M.F. Peers property, to transport its ore from Brandy B to Purcell. (E.g., PTX 3; Tr. at 218–19.)

257. On January 4, 1993, the Louisa County Board of Supervisors approved VVL's permit to mine Brandy B. The permit did not restrict the amount of reserves that could be mined. (Stip. ¶ 79; DTX 18.)

258. From Ms. Ely's course of conduct during her negotiations with Mr. Gumble, it is apparent that she did not seriously consider providing VVL with an off-road route across the M.F. Peers property. Ms. Ely's requests for "more information" were designed to delay any meeting between Mr. Gumble and the HGSI board pending a decision on VVL's permit to mine Brandy B. Ms. Ely opposes mining in Louisa County, and did not intend to facilitate what she ultimately filed suit to enjoin—mining on Brandy B—by providing VVL with a means of transporting ore from Brandy B to its mill on Purcell.

259. Ms. Patton testified that VVL caused the failed negotiations because VVL did not provide enough information for HGSI to assess adequately VVL's off-road proposal. (E.g., Tr. at 1205–25.)

260. While HGSI may not have had sufficient information to reach a final decision, it did have enough information to begin negotiations with Mr. Gumble. Essentially, those negotiations never began, as Ms. Ely never provided Mr. Gumble

with an opportunity to meet with HGSI's board.

261. It would have been futile for VVL to expend the resources necessary to accumulate more details for HGSI, given Ms. Ely's course of conduct during her negotiations with Mr. Gumble.

262. Meanwhile, on February 23, 1993, Mr. Poling prepared a draft memorandum to Mr. Walsh. This memorandum confirms that Grace and HGSI agreed to delay the A.D. Peers donation solely to "limit [VVL's] mining activities":

> Grace did not donate the 266 acre Alfred Peers property to Greensprings [sic] because of an option which Peers holds to purchase back 37 acres designated as Parcel "A" if Grace sold the property.... Parcel "A" is thought to contain vermiculite reserves which Peers could lease to Virginia Vermiculite if he exercised the option to purchase this parcel. The availability of Parcel "A" to Virginia Vermiculite was deemed significant only if Virginia Vermiculite's efforts to open a new mine on the adjacent Hill [Brandy] property was [sic] severely restricted by the pending use permit. A conditional use permit has subsequently been granted to Virginia Vermiculite which will not limit their mining activities substantially.
>
> ... I recommend that we formally ask Rae Ely to commit on this issue one way or the other, and proceed with the donation of the Peer's [sic] property to Greensprings [sic].

(PTX 340.)

263. In June 1993, HGSI filed a lawsuit against VVL in the state Circuit Court of Louisa County, to enjoin VVL and Brandy, Ltd. from mining Brandy B. *See Historic Green Springs, Inc. v. Brandy Farm, Ltd.,* 32 Va. Cir. 98 (1993) (the *"Brandy"* action), *reprinted at* 1993 Va. Cir. LEXIS 738. (Stip.¶ 80.)

264. In the *Brandy* action, HGSI contended that Grace's original 1973 Brandy Agreement with the Hills gave the lessee of Brandy A (Grace, and then HGSI) discretion to determine whether mining could occur both on Brandy A and on Brandy B. (Stip.¶ 81.)

265. VVL and Brandy Farm, Ltd. filed a counterclaim, alleging that Grace's Brandy A donation to HGSI breached Grace's duty to the Hills (Brandy, Ltd.), to exercise its contractual discretion (whether to commence mining) in good faith, by assigning the lease with a non-mining provision to an organization with no mining expertise. (Stip.¶ 82.)

266. On August 16, 1993, M.F. Peers wrote to Mr. Grace out of "desperation and anger." (PTX 44.) In part, the letter reads:

> You and your company have done a horrible thing. This is a personal appeal to you asking that you act to salvage what is left of a terrible situation before it is too late.
>
> W.R. Grace is killing my brother and has dealt my family a terrible blow. My brother is Alfred (Icky) Peers. He recently suffered a massive stroke and is in a nursing home. This is the third time my brother has been hospitalized since your employee Greg Poling came here late last year to inform us that W.R. Grace was giving *our land,* about 750 acres, to Historic Green Springs. Icky's first trip to the hospital was the *evening* of the day Mr. Poling informed him of the "gift." Earlier that very day I told Mr. Poling that this news would devastate my brother, and that if anything happened to him it was Grace's fault.
>
> Last year, your company announced it was *giving away our homeplace to a group we have fought for 20 years....*

... I want you to help me save my brother's life. *Please let us buy back his property, all of it.* ... I plead with you to stop any further transfer of any more of our homeplace to Historic Green Springs. Please tell Greg Poling to stop the torture of my brother. ... It is obvious ... that all he is interested in is making sure that my brother and his family will never re-gain control of his land. I must assume Mr. Poling is acting on your orders.

Here in Virginia we were raised to speak bluntly. ... You should know, as we do, a betrayal when you see one. (PTX 44 (emphasis in original).)

267. On August 31, 1993, Robert J. Bettacchi, President of Grace's Construction Products Division, responded to M.F. Peers's letter. Mr. Bettacchi told M.F. Peers that Grace already had made the decision to donate all of its holdings in Louisa County to HGSI. Mr. Bettacchi further stated that Grace "recognize[d] that ... you had expectations at the time your brother's property was sold to Grace in December, 1973 that mining would take place and that there would be some additional economic benefit to your brother," and was "sorry that our mutual expectations for additional economic benefit were not fulfilled." (PTX 45.)

268. On September 2, 1993, Mr. Walsh wrote to Mr. Bolduc, Grace's President and Chairman (Mr. Grace had retired by this time), in reference to A.D. Peers. Mr. Walsh indicated that Grace did not offer to sell all of A.D. Peers's land back to him because "it would have been totally inconsistent with our purposes in making the donation." According to Mr. Walsh, Grace was confident that if it had sold A.D. Peers's land back to him, "he would have, in turn, sold it or leased vermiculite rights to Virginia Vermiculite. Thus, the mining of the Louisa, Virginia area would continue for many more years by our competitor." Mr. Walsh described the prevention of such mining as one of Grace's "goals in 1992" and "purposes in making the donation," based on the relative locations of VVL's properties and the fact that VVL was "running low in terms of vermiculite reserves." (PTX 402.)

269. On September 28, 1993, the court in the *Brandy* action found that the modification of the Brandy Agreement, (*see* ¶ 85 *supra*), "gave Brandy the right to exercise unfettered control over the entire property, in exchange for which Brandy released Grace from the obligation to maintain and secure the property." The court, therefore, denied HGSI's claim. (Stip.¶ 83.)

270. The *Brandy* court also found in favor of VVL on its counterclaim, finding that by assigning its Brandy lease to HGSI, and by including non-mining provisions in the assignment, Grace breached its duty to exercise its contractual discretion in good faith. *See* 32 Va. Cir. at 102–03. The court voided the lease, and HGSI appealed. (Stip.¶¶ 84, 85.)

271. On December 18, 1993, Grace gave notice to the A.D. Peerses that it intended to donate the A.D. Peers properties to HGSI. (Stip.¶ 87.)

272. The donation was to be made because it was apparent that the delay no longer would adversely affect VVL's ability to mine in Virginia. (PTX 340.)

273. Pursuant to their 1973 Agreement with Grace, the A.D. Peerses chose to exercise their right to buy back Parcel A. (Stip.¶ 89.)

274. By deed dated January 25, 1994, Grace conveyed Parcel A back to the A.D. Peerses. (PTX 57; Stip. ¶ 89.)

275. Six days later, by deed dated January 31, 1994, Grace conveyed Parcel B to

HGSI. This conveyance was made subject to the terms of the unrecorded December 27, 1973 Agreement between the A.D. Peerses and Grace, pursuant to which Grace agreed to pay per ton vermiculite mining royalties to the A.D. Peerses. (PTX 59; Stip. ¶ 90.)

276. Grace claimed a substantial income tax deduction for its 1994 donation to HGSI. (Stip.¶ 92.)

277. When Grace donated Parcel B to HGSI, Grace did so in furtherance of its own interest, and with intentional disregard of the financial interest of the A.D. Peerses.

278. The January 31, 1994 deed contained no written restrictive covenants not to mine. (PTX 59; Stip. ¶ 91.)

279. VVL exhausted its Purcell reserves at some point in 1994. (Stip.¶ 94.)

280. By 1994, Grace viewed itself as supplying 51% of the concentrate consumed in North America, VVL as supplying 30% (17% from Virginia and 13% from South Carolina), and imports, primarily from Palabora, as supplying 19%. (PTX 383 at G16779.)

281. Grace no longer viewed VVL's South Carolina division as "potentially" competitive, as it did in 1986; Grace now characterized both of VVL's divisions as "major North American producers of concentrate." (PTX 179 at G16779.)

282. According to its 1994 business plan, Grace believed that U.S.-based producers of vermiculite had an advantage over most foreign-based producers, due to high shipping costs. However, Grace did not believe U.S.-based companies had an advantage over Palabora. Grace perceived Palabora as being "the only company with any significant success in exporting its vermiculite concentrate because of [its] ability to supply larger (coarse) sizes of the material," notwithstanding its shipping costs. (PTX 383 at G16780.)

283. On February 15, 1994, Ms. Ely wrote to Mr. Favorito, requesting that the restrictive covenants on the Lloyd I and Harris properties, originally conveyed as part of the December 22, 1992 donations, be revised. The letter indicates that Ms. Ely knew these properties originally "were purchased by Grace to facilitate on-loading of vermiculite onto trains which would be carrying it to the exfoliation or marketing sites." The restrictive covenants contained in the donation deed prevented HGSI from using the railroad siding for a commercial or other industrial use. Ms. Ely requested that the deeds be amended "in order that we might sell the property for use as a railroad siding or other commercial / industrial use." (PTX 438.)

284. Knowing that Grace would be concerned that a revision in the deed would permit VVL to use the railroad siding to mine or to transport its ore if VVL ever acquired the property, Ms. Ely said, "If [Grace] . . . wishes to retain any restrictive provisions, we would suggest that it be limited to the prohibition against mining vermiculite." (PTX 438.)

285. By "Correction Quit Claim Deed of Gift," recorded May 26, 1994, Grace and HGSI revised the restrictive covenants of the Lloyd I and Harris properties.

286. The correction replaced the general prohibition of any type of mining with a restriction that prohibited only the mining and transporting of vermiculite. (Stip. ¶ 102; PTX 58.)

287. HGSI and Grace changed the restriction from mining to vermiculite mining with the specific intent that the change benefit HGSI without benefitting VVL. Because the restrictions continued to prevent the transportation of vermiculite, HGSI would be able to use the properties

for commercial purposes, but VVL would not be able to use the properties to transport its vermiculite.

288. On June 20, 1994, the Supreme Court of Virginia refused HGSI's petition for appeal of the *Brandy* decision, (Stip.¶ 85), finding no reversible error in the judgment of the circuit court. (PTX 67.)

289. As a result of the decision in the *Brandy* action, VVL acquired the right to mine Brandy A, pursuant to the Brandy B mining lease between VVL and Brandy Farm, Ltd. (Stip.¶ 86.)

290. On August 9, 1994, Ms. Ely wrote a letter to Mr. Favorito of Grace, in which she stated:

> Historic Green Springs, Inc. has recently received the upsetting news that the State Supreme Court has refused to grant its appeal. The effect of this is to open Parcel B AND Parcel A of the Hill [Brandy] tract to vermiculite mining. Added to this is the thirty-seven (37) acre adjoining parcel reconveyed to the Peers, which we understand has been (or is about to be) leased to Virginia Vermiculite. Altogether, this frees up between seven hundred and fifty (750,-000) and one million (1,000,000) tons of vermiculite to VVL. *This appears to be enough reserve to keep VVL in business for the duration of the Nininger lease.*

(PTX 441 (emphasis added).)

291. As Ms. Ely predicted, the A.D. Peerses entered into an agreement with VVL on September 1994, which permitted VVL to mine Parcel A. (Stip.¶ 95.)

292. On September 29, 1994, HGSI issued a formal notice to the Niningers, terminating its lease of the Nininger property. (PTX 442; Stip. ¶ 96.)

293. HGSI terminated the Nininger lease because the Supreme Court of Virginia's *Brandy* decision frustrated HGSI's only purpose in maintaining the lease: to force VVL out of business in Virginia by preventing it from replenishing its depleting reserves.

294. Since the termination of the Nininger lease, the Nininger property has been, and remains, unleased by any mining company. (Stip.¶ 99.)

295. The Niningers, however, have attempted to find another mining company to mine and process the vermiculite reserves on their property. (Tr. at 462–69, 789–91.)

296. If VVL obtained rights to mine the Nininger property, it could extend its Virginia mining operations for another fourteen years. (Tr. at 469.)

297. From November 1994 through January 1995, VVL and HGSI met again, purportedly to revive the possibility of off-road haul. (*E.g.,* PTX 80, 81, 82.) The court accords little weight to the documents prepared during that period, as it is apparent they were prepared in anticipation of the instant lawsuit, which VVL filed against Grace and HGSI on February 21, 1995.

298. In making its donations to HGSI, Grace intended to eliminate its carrying costs, to obtain a substantial tax deduction and favorable publicity, and to injure VVL in its reputation, trade, business, and profession.

299. Grace did not intend to monopolize any appreciable part of interstate commerce, or any appreciable part of the trade or commerce within the Commonwealth of Virginia.

300. Grace did not donate its properties for preservationist reasons. (*E.g.,* PTX 138, 312 at 010438; Tr. at 1945.)

301. In receiving the donations from Grace, HGSI intended to preserve the Landmark District, and to injure VVL in

its reputation, trade, business, and profession. HGSI also knew of and knowingly acquiesced in Grace's intentions.

302. In furtherance of their joint intent to injure VVL in its reputation, trade, business, and profession, Grace and HGSI acted willfully, maliciously, and in concert.

303. Credibility of the witnesses in this case is a more difficult issue, but here, guidance is to be found in comparing the evidence *ore tenus* with the documentary evidence. Such a comparison for the witness, Ms. Ely, raises questions as to her credibility. As set out in paragraphs 179–83, 190–92, 206–13, 249–53, 258, and 283–93 *supra*, and paragraphs 11–21 and 107–116 *infra*, Ms. Ely's explanations—or lack of explanations—for a conflict between some of the documents and her testimony surpass the ability and common sense of the court to accept her explanations. Ms. Ely's testimony is therefore discounted because of this conflict.

304. Ultimately, neither VVL nor competition in any appreciable part of interstate or intrastate commerce was harmed by the donations.

305. Between 1991 and 1994, Grace's annual net income from its vermiculite business declined from $1,479,000 to $671,000. (PTX 383 at G16800.)

306. Between 1991 and 1994, VVL's annual net income from its vermiculite business increased from $529,948 to $857,324. (DTX 55 at 16455, DTX 57 at 16477.)

307. By 1998, VVL's net income had increased to $905,244. (DTX 61 at 17680.) Foreign imports of vermiculite concentrate into the North America had doubled since 1994. (Table 1.)

308. In 1998, of the vermiculite concentrate sold in North America, Grace sold approximately 39%, foreign imports accounted for approximately 31%, and VVL sold approximately 30% (18% in Virginia, 12% in South Carolina). (Table 1.)

309. In 1999, a company called Stansbury Holdings Corporation ("Stansbury") began to take measures to establish vermiculite operations in Dillon, Montana, where it has begun mining. (DTX 100.) Stansbury estimated that its Dillon property contains enough commercially-viable reserves to support the milling of 30,000 tons of ore per year for a period of twenty years. (PTX 116 at 10.) Although Stansbury apparently has yet to establish a profitable operation, (PTX 116 at 5), it acquired substantial assets in mid–2000 to "create the foundation for Stansbury's financial future." (DTX 100.)

310. HGSI currently controls both parcels of the M.F. Peers property and A.D. Peers Parcel B. Those properties contain approximately fifteen years' worth of vermiculite reserves. (Tr. at 283.)

311. VVL currently controls the Purcell property, both Brandy parcels, and the 37–acre A.D. Peers Parcel A.

312. VVL currently is mining only the Brandy parcels and A.D. Peers Parcel A, and VVL's only processing mill is located on the Purcell property. (Tr. at 113–17.)

313. From 1994 through July 2000, VVL incurred costs of $1,063,941 to use trucks to transport its ore out of the Brandy and Parcel A properties, along Route 22, and into the Purcell property. (PTX 83.)

314. If VVL continued to haul its ore in this manner, it would incur transportation costs of $2,701,073, from July 2000 through 2012. (PTX 83.)

315. VVL has plans to move its Purcell mill to the Brandy property. Through August 2000 it had expended $182,000 in plant move costs. (PTX 83.)

316. At its current production rates, VVL controls enough reserves in Virginia to last until the year 2012. VVL has approximately eight years of additional reserves in South Carolina. (Stip.¶ 17.)

## CONCLUSIONS OF LAW

VVL has brought this action contending that Grace and HGSI, by entering into the donation transactions, and by including restrictive covenants not to mine in the deeds of gift and lease assignments, conspired to eliminate VVL from doing business in Virginia. VVL asserts that Grace and HGSI so conspired with the specific intent that VVL be injured in its reputation, trade, business, and profession, and with the specific intent that Grace thereby obtain a monopoly in the production and sale of vermiculite concentrates in North America. Two causes of action remain in the case: (1) conspiracy to monopolize in violation of the Sherman Act and Virginia Antitrust Act, and (2) conspiracy to injure VVL in its reputation, trade, business, and profession, in violation of the Virginia Conspiracy Act.

## I. CONSPIRACY TO MONOPOLIZE

1. The Sherman Act makes it unlawful for any person to "combine or conspire to monopolize any part of the trade or commerce among the several States." 15 U.S.C.A. § 2 (West 1997).

2. Section 59.1–9.6 of the Virginia Code prohibits "[e]very conspiracy ... to monopolize ... trade or commerce of this Commonwealth." Va.Code Ann. § 59.1–9.6 (Michie 1998).

3. The plaintiff's claim under the Virginia Antitrust Act is governed by the same standard as its claim under the Sherman Act. *See Satellite Television & Associated Res., Inc. v. Continental Cablevision of Va., Inc.*, 714 F.2d 351, 358 n. 13 (4th Cir.1983).

4. The elements of a conspiracy to monopolize claim are: (1) concerted action; (2) a specific intent to achieve an unlawful monopoly; (3) commission of an overt act in furtherance of the conspiracy; and (4) antitrust injury. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir.1990).

5. The plaintiff in a civil action bears the burden of proving an antitrust violation, such as a conspiracy to monopolize, by a preponderance of the evidence. *See generally Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (noting that for "federal statutes such as the antitrust or civil rights laws ... proof by a preponderance of the evidence suffices"); *Ramsey v. United Mine Workers of Am.*, 401 U.S. 302, 308–11, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971) (holding that the preponderance-of-evidence standard applies in civil antitrust actions against labor unions).

## A. CONCERTED ACTION

6. "The Sherman Act contains a 'basic distinction between concerted and independent action.'" *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)).

7. "[L]awful acts may become unlawful when taken in concert." *United States v. United States Gypsum Co.*, 333 U.S. 364, 401, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

8. To establish concerted action for the purposes of a conspiracy to monopolize claim, it is necessary to prove that two or more parties acted with "a unity of purpose or a common design and under-

standing, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). *See also Monsanto*, 465 U.S. at 768, 104 S.Ct. 1464 (holding that "there must be evidence that tends to exclude the possibility of independent action").

9. The court has found that Grace and HGSI shared the goal of injuring VVL in its reputation, trade, business, and profession, (which intent is discussed more fully at ¶¶ 96–117 *infra* ), and that they acted in concert to achieve this goal. (*See* Findings of Fact ¶¶ 298, 301–02 *supra.*)

10. The court found that Grace and HGSI acted in concert, and not independently, based on the following facts.

11. In September 1992, Mr. Walsh met with Ms. Ely in Louisa County, to discuss Grace donating its properties to HGSI. It is undisputed that Mr. Walsh and Ms. Ely, at the same meetings, also discussed VVL's pending application to mine Brandy B. (Tr. at 1705.) The court perceives no reason for HGSI and Grace to have discussed VVL in such a context, except to assess how their joint conduct would affect VVL's business.

12. Mr. Walsh's notes of September 1, 1992, and his memorandum of September 17, 1992, confirm that this discussion related to HGSI's "plans and . . . attempts to stop VVL," and to how Grace and HGSI could coordinate their efforts to injure VVL. (PTX 317, 321.)

13. In at least one of Mr. Walsh's conversations with Ms. Ely during this period, they discussed "coordinat[ing]" a "meticulous time line." (PTX 349; Walsh Dep. (Dec. 2, 1997) at 39–41.)

14. Both Grace and HGSI understood that their joint goal of VVL going out of business in Virginia only could be accomplished with HGSI's cooperation, because if the properties were sold or donated to a third-party (such as another landowner, a different conservation group, or the government), the properties ultimately could be resold or leased to VVL. Ms. Ely attempted to convince Mr. Walsh that "[o]nly HGSI [was] motivated to . . . prevent future mining," and admonished that "[a]ny control put in the hands of third parties with unknown agendas will at best dilute and at worst defeat the original objectives." (PTX 326.) Mr. Walsh was of the same understanding. Grace knew that "[HGSI's] war with Virginia Vermiculite . . . ha[d] been going on for years," (PTX 321), and, as Mr. Walsh later told Mr. Kohnken, Grace decided against selling A.D. Peers back his entire property because Grace "[was] confident he would have, in turn, sold it or leased vermiculite rights to Virginia Vermiculite," (PTX 402), which was a contingency that donating to HGSI took into account.

15. Cooperation was evidenced further by: Mr. Walsh's attempt to convince Ms. Ely not to raise the issue of asbestos contamination to harm VVL (as such a subject also would harm Grace); the coordination of the donation announcement with the beginning of Ms. Ely's "war" against VVL; Mr. Walsh's premonition that VVL "may argue that Grace and [HGSI] have cooperated to [VVL's and the Louisa County landowners'] detriment," (PTX 321); Ms. Ely's faxing to Mr. Walsh a list of chemicals purportedly used in VVL's mining operations, (PTX 322, 349); and Ms. Ely's references to Grace's and HGSI's "joint and several goals," "the Grace/HGSI cooperative undertaking," and "the original objectives." (PTX 326.) The only "joint" goal that Grace and HGSI shared was VVL going out of business in Virginia.

16. Concerted action also is apparent from the face of the deeds and lease as-

signments containing restrictive covenants and provisions not to mine, including:

(a) Grace's 1992 donation of the M.F. Peers property with restrictive covenants not to mine, or to transport ore across the property;

(b) Grace's 1992 donation of its remaining properties in Louisa County (except the A.D. Peers property) to HGSI with the same restrictive covenants;

(c) Grace's 1992 assignment of the Brandy A lease to HGSI with provisions not to mine; and

(d) Grace's 1992 assignment of the Nininger lease to HGSI with the same provisions. All of these donations and restrictive covenants and provisions not to mine establish that Grace and HGSI formed a conscious agreement to prevent mining on the donated properties, beyond the simple agreement that the properties be donated.

17. Grace and HGSI jointly agreed to enter into an understanding to withhold the A.D. Peers donation in an attempt to "limit [VVL's] mining activities." (PTX 340.) Grace and HGSI understood that a delay might have prevented VVL from replenishing its depleting reserves if the Louisa County Board of Supervisors had denied VVL's permit to mine Brandy B, or restricted the amount of reserves that could be mined. (PTX 331.)

18. The fact of this understanding, as well as its purpose of injuring VVL, was established, *inter alia*, by the facts that:

(a) Mr. Poling's memorandum of November 10, 1992, expressed a desire to "enter into an understanding with Green Springs to delay the [A.D. Peers] donation ... [to] assure [VVL] does not mine Parcel 'A,'" (PTX 331);

(b) the A.D. Peers donation, in fact, was delayed;

(c) the only reason for the delay was "because of an option which Peers holds to purchase back 37 acres .... which Peers could lease to Virginia Vermiculite if he exercised the option to purchase the parcel," (PTX 340), thus allowing "the mining of the Louisa, Virginia area ... for many more years by our competitor," (PTX 342);

(d) "the availability of Parcel 'A' was deemed significant *only if* [VVL's] efforts to open a new mine on the adjacent [Brandy B] property was severely restricted by the pending use permit," (PTX 340 (emphasis added)); and

(e) Mr. Poling recommended proceeding with the donation once the Louisa County Board of Supervisors granted VVL the permit to mine Brandy B without substantial restrictions.

19. Joint action toward a common goal also was established by HGSI's assumption of the Nininger lease without any preservationist purpose, and for the sole purpose of preventing VVL from replenishing its depleting reserves. Evidence of concerted action in furtherance of such a purpose includes, *inter alia*, Ms. Ely's letter to Mr. Favorito of August 9, 1994, in which Ms. Ely stated that because of the *Brandy* decision, VVL would have "enough reserve to ... [stay] in business for the duration of the Nininger lease." (PTX 441.) The court perceives no reason why Ms. Ely would write to Grace to make such an observation, unless HGSI and Grace were acting together to prevent VVL from staying in business in Virginia.

20. Ms. Ely's letter to Mr. Favorito, dated February 14, 1994, also establishes that Grace and HGSI acted in concert. Ms. Ely raised the issue of amending the Lloyd I and Harris restrictive covenants to allow for commercial uses. She knew that HGSI and Grace originally had agreed to those restrictive covenants specifically to prevent VVL from using the railroad sid-

ing to transport its vermiculite in the event that VVL ever obtained the property, so she suggested to Mr. Favorito that the restrictive covenant "be limited to the prohibition against mining vermiculite." (PTX 438.)

21. The court finds that Grace's and HGSI's actions were not consistent with independent action, and that VVL proved by a preponderance of the evidence that HGSI and Grace acted in concert toward a common goal.

### B. SPECIFIC INTENT TO ACHIEVE AN UNLAWFUL MONOPOLY

■ 22. To prove a specific intent to monopolize, VVL must establish that Grace sought to create a monopoly over some appreciable part of interstate commerce. *See American Tobacco Co. v. United States,* 328 U.S. 781, 789, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Alexander v. National Farmers Org.,* 687 F.2d 1173, 1181–83 (8th Cir.1982); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 108 F.Supp.2d 549, 589–91 (W.D.Va.2000).

■ 23. With respect to HGSI's intent, "it is not necessary that HGSI have shared Grace's alleged anticompetitive motive in entering into a proscribed restraint; it is sufficient that HGSI, regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects." *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 156 F.3d 535, 541 (4th Cir.1998) (citing *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 161, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) ("[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one.") and *Duplan Corp. v. Deering Milliken Inc.,* 594 F.2d 979, 982 (4th Cir.1979) (*per curiam* ) ("Where, as here, the [defendants] were knowing participants in a

scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial.")).

■ 24. No economically-defined relevant market has to be proved to establish an intent to monopolize for the purposes of a § 2 conspiracy claim. *See Virginia Vermiculite,* 108 F.Supp.2d at 589–91.

■ 25. Nor does any "particular level of market power or 'dangerous probability of success' ha[ve] to be ... proved in a conspiracy claim where the specific intent to monopolize is otherwise apparent from the character of the actions taken." *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926 (9th Cir.1980); *see also American Tobacco,* 328 U.S. at 789, 66 S.Ct. 1125 (same); *Alexander,* 687 F.2d at 1182 (same).

26. "But where actions are ambiguous, the existence and extent of market power may make the inference of specific intent from conduct more or less plausible." *Hunt–Wesson Foods, Inc.,* 627 F.2d at 926.

■ 27. "Proof that the transactions in question were *primarily* motivated by legitimate business purposes rather than by specific intent to monopolize is a defense to ... conspiracy to monopolize." *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 691 F.2d 678, 690 (4th Cir.1982) (emphasis added). *Cf. Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (holding, in context of an attempt to monopolize claim, that "the necessary intent to monopolize ... is something more than an intent to compete vigorously").

28. Both sides presented evidence in support of their contentions that Grace and HGSI did or did not have an intent to monopolize when they entered into the donation transactions.

29. As the trier of fact, the court has considered the conflicting evidence, and, as indicated by the court's finding that Grace and HGSI did not have an intent to monopolize, (*see* Findings of Fact ¶ 299 *supra*), the court resolves this conflict in favor of HGSI.

30. The court finds that Grace and HGSI had mixed motives. Some of these motives were legitimate: Grace wished to eliminate its carrying costs, and to obtain a tax benefit and favorable publicity; HGSI sought to preserve the Landmark District. Another motive, shared by Grace and HGSI, was the specific and malicious intent to injure VVL in its reputation, trade, business, and profession, by preventing it from replenishing its depleting reserves. (*See* ¶¶ 96–117 *infra*.) The court does not consider this latter motive to be a "legitimate business purpose." *Hospital Bldg. Co.*, 691 F.2d at 690.

31. All of these motivations were sufficiently prominent that none can properly be considered a "primary" motivation.

■ 32. Notwithstanding Grace's and HGSI's joint intent to injure VVL in its reputation, trade, business, and profession, the court did not find that Grace had a specific intent to monopolize, or, therefore, that HGSI knew about or acquiesced in such an intent. The court so determined because a party's intent to injure its competitor to increase its competitive position is not equivalent to—and without more, is not sufficient to establish—an intent to create a monopoly. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) for the proposition that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws"); *United States Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 612, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (holding that " 'increasing sales' and 'increasing market share' are normal business goals, not forbidden by § 2 without other evidence of an intent to monopolize," and that the evidence presented did not "bridge the gap between the District Court's findings of intent to increase sales and its legal conclusion of conspiracy to monopolize"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir.1990) (finding no intent to monopolize in § 2 attempt case, because "the statements . . . do not show any evidence of illegal intent. . . [but] show only that AMI planned to increase its competitive activity in the Washington area").

33. "[C]ourts should be circumspect in converting ordinary business torts into violations of antitrust laws. To do so would be to create a federal common law of unfair competition which was not the intent of the antitrust laws." *Abcor*, 916 F.2d at 931 (internal quotation marks and citations omitted).

34. VVL established that Grace intended to maximize its competitive position by excluding VVL from doing business in Virginia, and that HGSI knew of and acquiesced in this motive, but not that Grace intended to achieve a monopoly by doing so.

35. Mr. Poling's memorandum of February 14, 1991, (DTX 138), well exemplifies the difference between an intent to monopolize and an intent to injure a competitor's business for the purpose of the state civil conspiracy statute, (*see infra*), and how Grace harbored the latter, but not the former, intent. On one hand, Mr. Poling stated that the only benefit of donating the properties to HGSI was that VVL would be prevented from acquiring and mining those properties. As discussed in greater

detail *infra*, this aspect of Mr. Poling's memorandum is probative evidence that Grace's intent in donating the properties was to injure VVL. On the other hand, Mr. Poling believed that there was no market benefit to the donations, because of foreign competition and ample reserves in South Carolina. This aspect of Mr. Poling's memorandum provides evidence that Grace's intent was not to monopolize the vermiculite industry.

36. The court finds it notable that Grace's and HGSI's internal memoranda, while evidencing a clear intent to limit VVL's access to reserves, appeared never to draw the further inference that such a limitation would lead Grace to obtain monopoly power.

37. Additional evidence that Grace did not intend to monopolize the vermiculite industry in making the donations includes the following.

38. Grace was aware when it made its donations in the early 1990s that VVL's South Carolina operations had expanded dramatically: CVC produced 1% of the vermiculite consumed in North America in 1986, and 13% in 1991, increasing VVL's total market share from 13% in 1986 to 30% in 1991. In 1991, Grace estimated that VVL was "under capacity" in South Carolina, which indicates Grace expected the South Carolina operations to continue to expand. (DTX 135; Poling Dep. (Nov. 20, 1997) at 373–78.)

39. VVL produced no evidence that Grace or HGSI ever took any actions with the intent to harm VVL's South Carolina operations, or to limit VVL's access to reserves in South Carolina. This suggests Grace's actions in Virginia were not intended to create a monopoly in North America, the segment of commerce VVL alleges Grace intended to monopolize. (*See* Pl.'s Proposed Conclusions of Law at 70 ¶ 235.)

40. Grace perceived itself to be in competition not only with VVL, but with foreign producers of vermiculite, particularly Palabora. (*E.g.*, PTX 76 at G015525 (characterizing Palabora as "the largest and most profitable vermiculite producer [which] dominates the industry with its 'benchmark' product quality and full range of concentrate sizes"); Rogan Dep. (Feb. 10, 1998), at 160 (confirming that Grace's competition in its vermiculite concentrates business were "VVL, ... the South Africans, and ... the Chinese"); Poling Dep. (Nov. 19, 1997) at 147 ("[W]e would compete with the sale of vermiculite concentrates from South Africa, from Virginia Vermiculite, from Carolina Vermiculite ....").)

41. Grace considered the competition by foreign producers to be expanding: In 1986, Grace estimated that Palabora produced 13% of vermiculite consumed in North America, and in 1991, foreign imports produced 23% of all vermiculite concentrate sold in North America.

42. Grace also considered its own market share of North American vermiculite concentrate sales to be declining, from 72% in 1986 to 47% in 1991. (*See also* PTX 76 at G015512 (describing itself as having a "declining share of the vermiculite concentrate market").)

43. Grace's perception that its market share was declining, and that VVL's and Palabora's market shares were expanding, "make the inference of specific intent ... less plausible." *Hunt–Wesson Foods, Inc.*, 627 F.2d at 926.

44. In 1992, Grace considered the vermiculite industry to be in an "overcapacity situation," and was concerned that "potential new suppliers ... will only ... continue the downward price pressure on VCX," Grace's vermiculite concentrate product. (PTX 76 at G015518.)

45. Moreover, on September 17, 1992—in the midst of Grace's concerted action with HGSI—Mr. Walsh wrote to Mr. Kohnken that "the vermiculite business is less important strategically today" and that "we have adequate reserves in South Carolina." (PTX 321.)

46. All of this evidence—including Mr. Poling's memorandum of February 14, 1991—indicates that Grace did not intend to monopolize any appreciable part of interstate commerce by donating its lands to HGSI and by including covenants not to mine in the donation deeds and lease assignments.

47. VVL argues, *inter alia*, that Grace calculated the benefit to itself of VVL closing its Virginia operations; that Grace knew its only competitor in North America in finer grades of vermiculite was VVL; that VVL's exit from the market would eliminate all competition in grades 4 and 5; that Grace knew VVL almost had exhausted its reserves in 1992 and might have had to close in Virginia if it did not secure additional reserves; that Grace entered into the transactions with HGSI with the intent of keeping the reserves from VVL; and that Grace and HGSI purposefully withheld the A.D. Peers donation until they could determine whether VVL could obtain a permit to mine Brandy B. (Pl.'s Proposed Findings of Fact ¶¶ 96–122; Pl.'s Proposed Conclusions of Law ¶ 249.)

48. The court does not find that these arguments, even if accepted, establish an intent to monopolize. Even if all of the propositions advanced by VVL were true, they do not "bridge the gap" between Grace's intent to enhance its competitive position by causing VVL to go out of business in Virginia, and the conclusion that Grace conspired to monopolize. *United States Steel*, 429 U.S. at 612, 97 S.Ct. 861. The above propositions do not establish that Grace intended that its actions cause VVL to be eliminated altogether from the vermiculite industry, or that Grace believed VVL's exit from Virginia would enable Grace to secure a monopoly. VVL's necessary, but unproved, assumption is that Grace intended to exclude VVL from Virginia in order to create a monopoly.

49. For example, VVL established that Grace calculated its benefit from increased business if VVL stopped mining in Virginia to be $1.5 million over twenty years. While this evidence tends to prove that Grace donated the properties to enhance its competitive position and to injure VVL's business, it does not show that the donations were made to create an unlawful monopoly. VVL characterizes Grace's calculation as a calculation of "anticompetitive" benefit. However, to infer from Grace's calculation that the benefit was intended to be anticompetitive, *i.e.* to "bridge the gap" and conclude that Grace intended to monopolize, would require proof of the additional fact that Grace believed this increased $1.5 million in business would lead to the obtention of a monopoly. This additional fact was not established by a preponderance of the evidence.

50. VVL maintains that Grace expected to obtain this $1.5 million "anticompetitive" benefit by raising the price of its finer grades of vermiculite, which VVL claims only it and Grace produce. There are several problems with this argument. First, VVL did not prove by a preponderance of the evidence that Grace believed it could obtain a monopoly in the North American production and sale of *all* vermiculite concentrates simply by raising prices in the finer grades. Second, VVL did not establish that Grace intended to raise the prices of those grades above a competitive price, or that Grace believed it could do so notwithstanding VVL's continued production in South Carolina. Third, at the time of the donations, Grace believed Palabora

had a "full range of concentrate sizes," (PTX 76 at G015525), and a "full product line" characterized by "excellent yields" and "high purity." (PTX 76 at G015524.) Fourth, VVL's argument reduces to a quasi-economic claim that Grace intended to monopolize the interstate commerce of particular grades of vermiculite. This argument is unavailing, not only because the court already has rejected VVL's assertion that separate markets exist for each grade of vermiculite concentrate, *see Virginia Vermiculite*, 108 F.Supp.2d at 584–86, but because VVL did not establish that Grace believed the interstate commerce of any particular grade of vermiculite could be monopolized.

51. The parties presented evidence on such matters as whether there are, in fact, economic substitutes for vermiculite, whether foreign imports in fact affect the price of vermiculite in the United States, and how various VVL customers and international vermiculite producers perceived the impact of foreign sales on the domestic vermiculite market. The court found this evidence to have very little, if any, probative value on the question of how Grace and HGSI perceived the industry, that perception being relevant to their alleged intent that Grace monopolize an appreciable part of interstate commerce. To the extent that VVL offered evidence of third parties' perceptions of the industry to establish an inference that Grace perceived the industry as the third parties perceived it, that inference was not drawn.

52. While the court cannot say definitively that Grace *did not* intend to monopolize an appreciable part of interstate commerce, the court concludes that VVL has not satisfied its burden of proving by a preponderance of the evidence that Grace *did* intend to monopolize an appreciable part of interstate commerce.

53. Taken as a whole, VVL's evidence of intent to monopolize, while sufficient to show that Grace and HGSI intended to drive VVL out of business in Virginia, (*see infra*), was not sufficient to show that, by driving VVL out of business in Virginia, Grace and HGSI intended that Grace achieve an unlawful monopoly over an appreciable part of interstate commerce, as required by the Sherman Act § 2.

54. The court concludes by addressing intent to monopolize for the purposes of the Virginia Antitrust Act. No evidence was presented that Grace intended to monopolize the vermiculite trade within Virginia; Grace never mined in Virginia, and abandoned all of its vermiculite reserves in Virginia. For these reasons, the court found Grace did not intend to monopolize the trade or commerce of vermiculite within the Commonwealth of Virginia. (*See* Findings of Fact ¶ 299 *supra*.)

55. Although VVL failed to prove a specific intent to monopolize, the court shall address briefly the element of antitrust injury, which VVL also has failed to prove.

## C. ANTITRUST INJURY

56. The Clayton Act provides a private party—as opposed to the United States Department of Justice or the Federal Trade Commission—with standing to sue for violations of the Sherman Act.

57. Section 4 of the Clayton Act (" § 4"), 15 U.S.C. § 15(a), authorizes private actions for treble damages. Section 16 (" § 16"), 15 U.S.C. § 26, authorizes private actions for injunctive relief.

58. The Supreme Court has established several requirements to determine whether an antitrust plaintiff has standing to seek antitrust remedies under the Clayton Act. *See Cargill v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 & n. 5, 107 S.Ct. 484,

93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 219–20 (4th Cir.1987).

59. The first requirement is that the plaintiff have suffered "antitrust injury"; if this is satisfied, then other factors, such as direct causation in fact between the plaintiff's injury and the defendant's alleged antitrust violations, also must be considered to determine whether the plaintiff may sustain a claim under the Clayton Act. *See Cargill,* 479 U.S. at 110 n. 5, 107 S.Ct. 484; *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

[10] 60. "[A]ntitrust injury ... is ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)).

[11] 61. The plaintiff must establish "harm, not just to a single competitor, but to the competitive process, *i.e.,* to competition itself." *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). *See also id.* at 139, 119 S.Ct. 493 (applying this principle to § 2 conspiracy claim).

62. To prove harm to the competitive process, the plaintiff must prove that "the damages sought ... flow from that conduct which is proscribed by the antitrust laws." *Thompson Everett, Inc. v. National Cable Adver., L.P.,* 57 F.3d 1317, 1325 (4th Cir.1995) (citation omitted) (emphasis omitted). *See also Sullivan v. National Football League,* 34 F.3d 1091, 1097 (1st Cir.1994) ("[A]n action harms the competitive process 'when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods.'" (quoting *Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 22 (1st Cir.1990))).

63. Following this court's summary judgment opinion, VVL has only one remaining claim for damages: past and future transportation damages, from 1994 to 2012. (*See* PTX 83.) VVL alleges it could not conduct off-road hauling of its ore and tailings mined at the Brandy and A.D. Peers Parcel A properties to the processing plant at Purcell, due to HGSI's M.F. Peers property being situated directly between Purcell and the others. VVL bases its past transportation damages on actual costs of on-road hauling of raw ore to its Purcell mill, and bases its future transportation damages on the projected costs of hauling raw ore to the mill, and pumping tailings back to the mine site for restoration, up to the time that it anticipates it will deplete its Virginia reserves.

[12] 64. To establish antitrust injury flowing from Grace's and HGSI's concerted actions. VVL first advances several arguments that competition would be harmed if VVL stopped mining in Virginia. VVL maintains that, if it depleted its reserves in Virginia, the only competition Grace would face would be from foreign producers who must pass along higher transportation costs; that consumers could not rely on obtaining a steady source of vermiculite at a competitive price prior to VVL's entry in the market; that VVL's entry into the marketplace made vermiculite concentrate prices competitive; and

that market conditions "may" return to an uncompetitive state should VVL no longer be able to produce vermiculite from Virginia reserves. (*E.g.,* Pl.'s Proposed Findings of Fact ¶¶ 152, 159, 165, 167.)

65. These propositions, even if true, are irrelevant. At issue is not whether competition *would be* or *may be* harmed, but whether competition *was* or *will be* harmed, by Grace's and HGSI's concerted actions. Is it undisputed that Grace and HGSI, in fact, *did not* drive VVL out of the market. VVL currently has enough reserves to keep mining in Virginia until 2012 and enough reserves in South Carolina to last another eight years; VVL operates profitably in South Carolina notwithstanding transportation distances twenty times greater than those in Virginia (where VVL only transports its ore over a one-half mile stretch of Route 22); VVL's net income increased during and after the period that the donations were made; and VVL's market share has remained stable since that period. VVL concedes that "HGSI has not . . . been able to prevent VVL from mining." (Pl.'s Proposed Findings of Fact ¶ 17.) Consequently, what might happen if VVL ultimately exits the market in the future in no way tends to prove that competition actually *was* harmed by Grace's and HGSI's concerted action.[2]

66. VVL argues that if it proved that Grace's and HGSI's concerted actions caused it to suffer transportation damages, any such damages necessarily would harm competition because VVL is Grace's only other domestic competitor. VVL further contends that because those transportation damages in fact led it to raise the price of its vermiculite, harm to competition flowing from Grace's and HGSI's concerted action was shown.

67. VVL's arguments are premised on the mistaken assumption that Grace's and HGSI's concerted actions caused it to suffer transportation damages.

68. Since the beginning of the instant action, causation has been the principal gap in VVL's allegations. At the summary judgment stage of these proceedings, VVL failed to produce sufficient evidence that Grace had a duty to deal with VVL under the antitrust laws, *see Virginia Vermiculite,* 108 F.Supp.2d at 600–01, and the question of how VVL was injured by the transfer of properties in which it had no legal interest, was not answered at trial.

69. The crux of an antitrust action is individual injury in fact. *See Windham v. American Brands, Inc.,* 565 F.2d 59, 66 (4th Cir.1977); *see also Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 129 (4th Cir.1995) (noting that injury in fact is required to prove damages, and also is relevant to determine standing).

70. To prove injury in fact, VVL must establish "*some* damage flowing from the unlawful conspiracy . . . . It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (emphasis in original).

71. In this case, "the relevant question for causal purposes is . . . whether Grace *would have* allowed mining in the absence of both the donation and the nonmining agreements." *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.,* 156 F.3d 535,

---

**2.** The question of whether competition *will be* harmed by Grace's and HGSI's concerted ac-

tion is addressed infra at paragraphs 83–87 *infra.*

539 (4th Cir.1998) (emphasis added; original emphasis omitted).

72. "[E]ven if Grace lawfully *could have* donated the lands to HGSI without the nonmining agreements, it is foreclosed from challenging causation simply on the basis that it *could have* achieved the same result through lawful means." *Id.* (emphasis added).

73. Having considered the evidence and testimony presented at trial, the court concludes that VVL failed to prove by a preponderance of the evidence that Grace *would have* sold or leased its properties to VVL, or that Grace otherwise would have allowed VVL to mine those properties in the absence of both the donations and covenants not to mine.

74. But for the donations to HGSI, Grace would have been in the position it was in before it decided to make the donations, *i.e.* faced with a variety of options for the disposition of its properties.

75. Although the option of selling to VVL remained a possible option for Grace through July 1992, this option appeared to be less viable than Grace's other options, given the failure of Grace's previous negotiations with VVL. Despite Dr. Sansom's attempt at trial to explain why his counter-offer of $1.75 million at the third meeting technically was not lower than his original offer of $1.75 million, the fact remains that Grace perceived Dr. Sansom's offer as being inadequate, and as indicating VVL's inability or unwillingness to deal with Grace. (DTX 7, 137.) Moreover, Grace was aware of the obvious business disadvantages of selling its reserves to its principal competitor, and had other interests besides obtaining immediate income, such as maintaining a defensive posture on its reserve base. (*E.g.*, DTX 135, 138; PTX 14, 312.) None of those interests could have been accomplished by Grace selling its reserves to VVL.

76. Therefore, but for the donations, Grace likely would have pursued one of its other options, such as selling the properties for a non-mining use (thus maintaining the mineral rights) to a third party or to the government, or retaining the properties without mining them, as it had for twenty years.

77. It thus was not proven that Grace would have sold to VVL under any circumstances, let alone "but for" the concerted action.

78. VVL also argues that the donation of the M.F. Peers property with the restrictive covenant not to mine caused VVL to incur transportation damages because the restrictive covenant prohibited the cross-river transportation of vermiculite over the M.F. Peers property. As a direct result, VVL contends, it could not transport ore across the same and had to use the road and incur transportation costs.

79. The court agrees that the restrictive covenant not to mine prohibited HGSI from allowing cross-river transportation of vermiculite over the M.F. Peers River Property. However, the court does not conclude that the prohibition was a material cause of VVL not being able to transport ore across the same. Neither Grace nor HGSI would have allowed such access even if there were no restrictive covenants on the M.F. Peers property. Grace had no interest in assisting one of its principal competitors, and Ms. Ely's course of conduct during her negotiations with Mr. Gumble indicated that she never seriously considered providing such access to VVL. HGSI's "war" with VVL and with Dr. Sansom "ha[d] been going on for years." (PTX 321.) Like Grace, HGSI intended to injure VVL, not assist it.

80. Moreover, transportation costs typically are a part of doing business as a vermiculite mining company. (*E.g.*, Tr. at

969; PTX 383 at G16786.) In South Carolina, VVL must transport its ore over a distance twenty times greater than in Virginia. VVL would have incurred its transportation costs even if the concerted action never had occurred.

81. The court concludes that VVL did not prove by a preponderance of the evidence that Grace's and HGSI's concerted action materially caused or will cause VVL to suffer transportation damages.

82. VVL accordingly did not prove that Grace's and HGSI's concerted action actually caused it any injury, or had any adverse effect on competition.

83. Section 16 of the Clayton Act differs from § 4 in that the latter requires a showing of actual injury while the former only requires a showing of threatened injury. Section 4 requires proof of injury to "business or property," while § 16 does not.

84. The Supreme Court has held that "[i]t would be anomalous ... to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). Therefore, the Supreme Court held that a plaintiff seeking injunctive relief under Clayton Act § 16 must show "a threat of antitrust injury." *Id.* at 122, 107 S.Ct. 484.

85. Because VVL has reserves in Virginia sufficient to keep it in business through the year 2012, VVL argues that Grace's and HGSI's concerted actions threaten antitrust injury because the actions set in motion events that will cause VVL to go out of the market in the future, *i.e.* in the year 2012.

86. The court rejects this argument. To conclude that Grace's and HGSI's concerted actions set in motion events that will cause VVL to go out of the market would require an excessive degree of speculation. Grace's and HGSI's actions had no effect on VVL's ability to operate in Virginia or South Carolina, and even if VVL ultimately depletes its current reserves, it could stay in business for decades if it acquired some or all of the millions of reserves available in South Carolina and in the Nininger property. Therefore, even if VVL ultimately goes out of business, it cannot be said with sufficient certainty that it will have done so as a result of Grace's and HGSI's actions.

87. VVL maintains that although the Niningers are seeking to lease their reserves for mining, VVL will be unable to mine the property because HGSI will oppose any permits for such use. The court rejects this argument because the inferences necessary to reach the conclusion that VVL will not be able to mine the Nininger property are "so tenuous and speculative that they may not be reasonably drawn from the circumstantial evidence." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.1958). To reach the conclusion VVL seeks to draw, the court would have to assume, at minimum, that VVL would not be able to obtain such a permit if HGSI opposed it. This assumption not only would be speculative, but historically unfounded, as VVL obtained mining permits in the past notwithstanding HGSI's opposition.

88. In summary, the court concludes that VVL has not proven that Grace and HGSI entered into the transactions with the specific intent that Grace obtain an unlawful monopoly, or that Grace's and HGSI's concerted action actually caused, has threatened to cause, or will cause, any antitrust injury. Accordingly, VVL has not established by a preponderance of the evidence that HGSI is liable for conspiracy to monopolize in violation of the Sherman

Act § 2, and the Virginia Antitrust Act § 59.1–9.6.

## II. VIRGINIA CONSPIRACY ACT

■■■ 89. The Virginia Conspiracy Act subjects to criminal liability any two persons who "combine, associate, agree, mutually undertake or concert together for the purpose of ... willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va.Code Ann. § 18.2–499 (Michie 1996). Any person injured by reason of a violation of § 18.2–499 may file a civil action and recover treble damages pursuant to § 18.2–500(a), and injunctive relief pursuant to § 18.2–500(b).

■■■ 90. The elements of a statutory conspiracy claim under the Virginia Conspiracy Act are: (1) concerted action (2) legal malice; and (3) causally-related injury. *See Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526 (4th Cir.1997); *Simmons v. Miller*, 544 S.E.2d 666, 676–77 (Va.2001); *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984).

■■■ 91. The plaintiff bears the burden of proving a violation of the Virginia Conspiracy Act by clear and convincing evidence. *See Simmons*, 544 S.E.2d at 676–77; *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 526 (4th Cir.1997).

### A. CONCERTED ACTION

92. The plaintiff's first burden is to show that HGSI and Grace "combined, associated, agreed, mutually undertook, or concerted together." *Simmons*, 544 S.E.2d at 677.

93. The evidence of concerted action summarized *supra* with respect to the counts for conspiracy to monopolize established clearly and convincingly that Grace

and HGSI acted in concert, and not independently.

### B. LEGAL MALICE

94. The element of legal malice requires the plaintiff to prove that the concerted action was undertaken to injure the plaintiff "intentionally, purposefully, and without lawful justification." *Simmons*, 544 S.E.2d at 677; *Tazewell Oil Co. v. United Va. Bank*, 243 Va. 94, 413 S.E.2d 611, 619 (1992).

■■■ 95. The Virginia Conspiracy Act "does not require that the *co-conspirator* act with legal malice. Rather, the statute simply requires that one party, acting with legal malice, conspire with another party to injure the plaintiff." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 527 (4th Cir.1997) (emphasis added).

### 1. PURPOSE OF INJURING REPUTATION, TRADE, BUSINESS, OR PROFESSION

■■■ 96. The evidence presented at trial established clearly and convincingly that Grace and HGSI undertook their concerted action intentionally and purposefully to injure VVL's business. Grace and HGSI intended that their actions cause VVL to go out of business in Virginia by preventing VVL from replenishing its diminishing reserves.

97. Although Grace and HGSI also harbored collateral, independent motives— Grace intended to receive a tax deduction and favorable public relations, and HGSI intended to preserve the Landmark—their shared purpose of injuring VVL in its business is sufficient to establish the requisite intent under the Virginia Conspiracy Act. *See Simmons*, 544 S.E.2d at 677 ("Code §§ 18.2–499 and –500 do not require a plaintiff to prove that a conspirator's pri-

mary and overriding purpose is to injure another in his trade or business.").

98. The court's finding that Grace and HGSI shared the joint intent of injuring VVL in its reputation, trade, business, and profession, is based on the following facts.

99. In the 1970s, Grace, VVL, and HGSI all converged upon Louisa County. For the two decades leading up to the donations, each mutually opposed the others' practices and interests in the District.

100. During that period, HGSI opposed mining by Grace and by VVL. Ms. Ely intensely researched the vermiculite industry, frequently appeared in opposition to Grace at meetings of the Louisa County Board of Supervisors, studied the area, advised local residents about mining and preservation, and organized grass-roots efforts to oppose mining and development. (*E.g.*, Stip. ¶ 58; (Ely dep. (Apr. 14, 1999) at 430); PTX 457, 458, 460; Tr. at 1689–91, 1869–84.) Ms. Ely advised Mr. Gumble that if VVL attempted to mine south of Route 22, the "Maginot line," VVL could expect "World War III." (Tr. at 282.)

101. Ms. Ely's intent is imputable to HGSI, not only because she served as its President, but because she effectively gained exclusive control over HGSI's operations in the early 1990s. (*E.g.*, PTX 94, 94, 107, 121.)

102. During those same two decades, Grace had a "strategy" of holding its reserves solely to keep those reserves from its competitor, VVL. (PTX 312, 321; DTX 138.)

103. When Grace decided to reevaluate the viability of this strategy in the early 1990s, HGSI and Grace realized that their joint antipathy of VVL could work to their mutual benefit.

104. Prior to the donations, both Grace and HGSI knew that VVL was depleting its reserves in Louisa County, and that

VVL was seeking to acquire more reserves, specifically on Brandy B. (*E.g.*, PTX 68, 76, 78, 120, 303, 312, 321; DTX 138; Tr. at 1705.)

105. Grace perceived that the manner in which it disposed of its properties could influence VVL's "ability to continue to operate," (DTX 133 at G003189; 76 at G015522; PTX 312 at 010439), such that VVL could be "forced to cease operations" in Louisa County if VVL was unsuccessful in obtaining additional reserves. (DTX 138 at G003119.)

106. Grace calculated how much its vermiculite business would benefit from VVL closing in Virginia due to a lack of reserves, and how much VVL's vermiculite business would benefit if VVL obtained Grace's Virginia reserves. (PTX 303, 313.)

107. The September 1992 meetings between Grace and HGSI marked the beginning of their agreement that their joint interests would be served by VVL running out of reserves in Virginia. It is undisputed that at the meetings of September 1 and 2, 1992, at which Grace and HGSI discussed the feasibility of a donation, Ms. Ely and Mr. Walsh also discussed the fact that VVL was applying for a permit to mine Brandy B. (Tr. at 1705.) This indicates HGSI and Grace discussed how a donation would impact VVL, given VVL's shortage of reserves. Mr. Walsh's notes of September 1 confirm that he and Ms. Ely discussed the "Virginia Vermiculite plans" and "[HGSI's] attempts to stop Virginia." (PTX 317.)

108. Mr. Walsh's memorandum of September 17, 1992, also confirms that the discussion included Grace's strategy of keeping reserves from VVL; that Ms. Ely was interested in assuming Grace's lease obligations to "keep[ ] the reserves off the market"; and that in discussing VVL's pending permit application, Ms. Ely ex-

pressed to Mr. Walsh that she was interested in "taking on" VVL in the "war of all holy wars," and in reporting purported environmental problems with VVL's operations. (PTX 321.)

109. Ms. Ely faxed Mr. Walsh a list of chemicals supposedly used in VVL's mining operations. (PTX 322, 349.) Ms. Patton of HGSI could think of no legitimate reason for Ms. Ely to have done so. The only plausible explanation is that Ms. Ely was discussing such matters with Mr. Walsh in furtherance of HGSI's and Grace's concerted effort to injure VVL, and, in this instance, to identify possible ways in which VVL might have violated environmental laws.

110. Ms. Ely assured Grace that its interests would be served best by cooperating with HGSI, because "only HGSI [was] motivated to ... prevent future mining." (PTX 326.)

111. In Ms. Ely's September 28, 1992, letter, she observed that Grace and HGSI had "joint and several goals." (PTX 326.) The only "joint" goal that Grace and HGSI shared was VVL going out of business in Virginia.

112. The timing of the donations was important to both Grace and HGSI, because both knew that VVL was running out of reserves, and hoped that the donations would prevent VVL from acquiring the reserves it needed to stay in business in Virginia. This joint intent was established, *inter alia,* by:

(a) Mr. Kohnken's September · 1992 memorandum, in which he recognizes— twelve days before the donations were announced—that VVL was about to apply for new mining permits, and in which he states that "[b]ecause of the new development at Virginia Vermiculite, I propose we proceed and make our announcement next week ...." (PTX 320);

(b) Ms. Ely's letter to Grace on November 18, 1992, in which she cited "everyone's interest" in Grace making a well-timed conveyance of the M.F. Peers River Property, "since doing so will produce the maximum benefit," (PTX 431);

(c) Mr. Walsh's memorandum to Mr. Bolduc, which states that Grace's "goals in 1992" and "purposes in making the donation" included preventing "the mining of the Louisa, Virginia area ... by our competitor," based on the relative locations of VVL's properties and the fact that VVL was "running low in terms of vermiculite reserves," (PTX 402);

(d) Mr. Walsh's notes of a conversation he had with Ms. Ely, in which they discussed "coordinat[ing]" a "meticulous time line," (PTX 349; Walsh Dep. (Dec. 2, 1997) at 39–41);

(e) HGSI's and Grace's ultimate agreement to delay the donation of the A.D. Peers property for the sole reason that an earlier donation of that property might have provided VVL with an opportunity to replenish its depleting reserves, (*see* PTX 331, 340, 342, 402); and by

(f) HGSI's ultimate assumption of the Nininger lease for the sole purpose of preventing VVL from replenishing its depleting reserves, and its abandonment of that lease once it became clear that VVL would not run out of reserves. (*See infra.*)

113. Grace and HGSI agreed to include the restrictive covenants with the donations to prevent VVL from mining the donated properties or using them to transport its ore. This intent was established by the following evidence:

(a) Mr. Hackett's notes of September 9, 1992, indicate Grace was considering a charitable donation, "as long as there is some protective clause against allowing any Grace competitor, at any future time, to conduct mining operations," (PTX 450);

(b) None of Grace's objectives in making the donations was to further preservationist interests, (PTX 312), but Mr. Walsh wished to include non-mining restrictions with any donation, (PTX 350 at G013749), which indicates that Grace only wished to include non-mining restrictions to prevent VVL from mining;

(c) Ms. Ely conceded on cross-examination that she did not believe Grace was interested in preservation, (Tr. at 1945), and that she knew it was not necessary for Grace to include restrictive covenants in order to donate to HGSI or to claim a tax deduction, (Tr. at 1964–65; cf. Stip. ¶ 92);

(d) The restrictive covenants agreed to by Grace and HGSI contain much more detailed prohibitions against any type of mining or transportation of ore than conservation easements to which HGSI agreed in connection with other properties, (PTX 90, 91; DTX 33);

(e) Grace and HGSI intended to prevent VVL from using the M.F. Peers River Property to transport the vermiculite VVL eventually would mine at Brandy B to its mill at the Purcell property, which intent is clear from the fact that Mr. Gumble had informed Mr. Poling shortly prior to the M.F. Peers donation that VVL wanted to use the River Property for that exact purpose, (PTX 14; Tr. at 356–59);

(f) Because two of the properties donated in 1992, the Lloyd I and Harris properties, are located at a railroad siding outside of the Landmark District, (PTX 438), it is not plausible that Grace and HGSI agreed to include restrictive covenants on those properties in furtherance of a preservationist purpose;

(g) Neither HGSI nor Grace believed that the Lloyd I and Harris properties contained any vermiculite, and both realized that their only value to a vermiculite company would be for transportation purposes, (PTX 438), which indicates that HGSI and Grace agreed to restrictive covenants on those properties solely for the purpose of preventing VVL from using the railroad siding for transportation purposes;

(h) Ms. Ely's letter of February 15, 1994, describing her desire to use the Lloyd I and Harris properties "for use as a railroad siding or other commercial . . . [or] industrial use," (PTX 438), her suggestion that "[i]f [Grace] . . . wishes to retain any restrictive provisions . . . it be limited to the prohibition against mining vermiculite," (PTX 438), and the correction quit claim deed itself, all confirm that Ms. Ely was not concerned about the industrial uses of those properties, and that HGSI's and Grace's original intent in including the restrictive covenants on the Lloyd I and Harris properties was not to further preservationist interests, but simply to injure VVL in its business.

114. From the facts that the original draft of the A.D. Peers deed contained the same restrictive covenants as the properties transferred in 1992, (Stip.¶ 93), and that Grace and HGSI cooperated closely to prevent VVL from mining the donated properties, including delaying the donation of the A.D. Peers property, it appears that Grace and HGSI had an understanding that HGSI would prevent mining on the A.D. Peers property to the same degree as it would with the other donated properties.

115. It likewise appears that the only reason the restrictive covenants were removed from the A.D. Peers donation deed was because Grace and HGSI knew from the *Brandy* decision that including such covenants likely violated Grace's duty of good faith and fair dealing towards the property owner, and Grace and HGSI wished to avoid the rescission of the A.D. Peers donation.

116. The Nininger property was transferred only to further HGSI's and Grace's joint goal to prevent VVL from replenishing its depleting reserves; it was not transferred for any preservationist or other legitimate reason. This intent was established by:

(a) The fact that it was not a common practice among preservationist groups to assume payment obligations under mining leases, (Tr at 2126–27);

(b) Mr. Walsh's September 1992 memorandum to Mr. Kohnken, which indicates that HGSI agreed to assume the obligations under Grace's mineral lease agreements, including future annual payments, to "keep[ ] the reserves off the market," (PTX 321 at G013718);

(c) Ms. Ely's August 9, 1994 letter to Grace regarding the Nininger property, in which she expressed her dismay that the denial of the *Brandy* appeal appeared to provide VVL access to "enough reserve to keep VVL in business for the duration of the Nininger lease." (PTX 441.) This letter *alone* establishes that HGSI and Grace were acting in concert, that their goal in making, at minimum, the Nininger donation, was to "keep VVL [out of] business," and that HGSI not only was aware of this goal, but itself had the specific intent that the donation harm VVL's business; and

(d) The fact that HGSI stopped paying the Nininger lease—thus returning the leasehold to the Niningers' control, exposing it to be mined—only once it became clear that keeping the property away from VVL would not cause VVL to run out of reserves, which indicates that the only reason HGSI accepted the Nininger donation in the first instance was to attempt to force VVL to run out of reserves in Virginia.

117. The evidence recited above establishes clearly and convincingly that HGSI and Grace combined, associated, agreed, mutually undertook or concerted together for the purpose of willfully and maliciously injuring VVL in its reputation, trade, business, and profession.

2. WITHOUT LAWFUL JUSTIFICATION

118. "Without lawful justification" means that the defendants contrived "to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1284 (4th Cir.1987) (quoting *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 337 S.E.2d 744, 748 (1985)); *cf. Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.*, 260 Va. 35, 530 S.E.2d 668, 675 (2000) (holding that "the failure of legal justification may include a breach of ... fiduciary duty or assisting someone to breach their fiduciary duty" (internal quotation marks omitted)).

119. The Virginia Conspiracy Act thus requires that the plaintiff prove that at least one of the co-conspirators acted *either* with an unlawful purpose, *or* by unlawful means. *Cf. Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 527 (4th Cir. 1997) (holding that the Virginia Conspiracy Act "does not require that the co-conspirator act with legal malice").

120. In the present case, Grace donated its properties to HGSI by unlawful means, namely, by breaching its contractual duty of good faith and fair dealing toward the M.F. and A.D. Peerses.[3]

---

**3.** The court accordingly need not decide whether the specific intent to drive VVL out

of business in Virginia alone is a sufficiently

121. Citing the court's summary judgment opinion, HGSI maintains that the law of the case bars VVL from arguing any unlawful purpose or means except conspiring to monopolize. This is not so. The court previously held that VVL's evidence concerning a conspiracy to monopolize was sufficient to withstand a motion for summary judgment on the Virginia Conspiracy Act claim. *See Virginia Vermiculite*, 108 F.Supp.2d at 606. The court did not thereby hold that the Virginia Conspiracy Act claim *only* could be supported by the evidence of a conspiracy to monopolize; the court simply did not expound needlessly upon the other evidence that supported that claim, such as evidence that Grace breached its contractual duty of good faith and fair dealing.

122. Furthermore, although VVL's and the Peerses' causes of action against Grace for breach of the duty good faith and fair dealing were dismissed when VVL and the Peerses settled with Grace, the fact of the breach by Grace, one of the alleged coconspirators, still can serve as a predicate for a finding of unlawful means under the Virginia Conspiracy Act. *See Multi–Channel*, 108 F.3d at 527.

123. Virginia contract law recognizes a cause of action for failure to exercise contractual discretion in good faith. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 542 (4th Cir.1998) (holding that "it is a basic principle of contract law in Virginia ... that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party" (emphasis in original)); *Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 102–03 (1993) (holding that Grace breached its good faith duty to the

"unlawful" purpose under the Virginia Conspiracy Act.

owner of the Brandy properties by transferring Brandy A to HGSI).

124. "[T]o ... establish[ ] 'bad faith' on the part of contracting parties who are merely under the obligation to exercise good faith in the conduct of a business relationship.... [the plaintiff] is required to show that the [defendant] acted in furtherance of its own interest, with intentional disregard of the financial interest of the [plaintiff]." *State Farm Mut. Auto. Ins. Co. v. Floyd*, 235 Va. 136, 366 S.E.2d 93, 97 (1988); *see also Virginia Vermiculite*, 108 F.Supp.2d at 608 (collecting cases).

125. By its original agreements with the A.D. Peerses and M.F. Peerses, Grace had discretion whether to mine the Peerses' properties under the contracts that provided for mining royalties if mining took place. VVL contends that Grace's donation of the A.D. Peers and M.F. Peers properties to an organization that has conducted a twenty-year campaign against the mining of vermiculite in Louisa County breached Grace's duty to exercise its contractual discretion in good faith.

126. The court agrees, based on the additional fact that, in so donating its properties, Grace acted in furtherance of its own interest and with intentional disregard of the financial interest of the Peerses.

127. Grace claimed substantial tax deductions for the donations of the Peerses' properties, (Stip.¶¶ 78, 92), which demonstrates it acted in furtherance of its own financial interest.

128. Grace was aware of the Peerses' financial interest in receiving per ton mining royalties when it first purchased their properties:

(a) Since the early 1900s, the Peers family used its land in Louisa County for commercial purposes, (Tr. at 496–526);

(b) When Grace approached M.F. Peers in 1972 and A.D. Peers in 1973, it told them it sought to buy their properties in order to mine them, (e.g., Tr. at 536–37);

(c) Given their background, the Peerses agreed, and sold their land to Grace with the expectation of receiving royalties from the mining, (Tr. at 536–37; PTX 45);

(d) Grace entered into detailed agreements with the Peerses pursuant to which Grace would pay them "per ton" royalties if Grace, in its sole discretion, decided to mine the properties, (Stip.¶¶ 28, 32–34);

(e) Notwithstanding the discretionary clauses, Grace promised M.F. Peers that it was going to mine his property within two years, and knew of the Peerses' expectations that the properties would be mined. (Tr. at 536–38; PTX 45 at B0184 ("We recognize that . . . you had expectations at the time your brother's property was sold to Grace . . . that mining would take place.").)

129. Grace intentionally disregarded the Peerses' financial interest when it donated the Peerses' properties to HGSI:

(a) Instead of mining the Peerses' properties as it had promised, Grace donated the properties to HGSI—an organization that Grace knew had opposed mining for two decades—and included restrictive covenants in the donation deeds with the specific intent that no subsequent purchaser or lessee be able to mine the properties;

(b) Before the donations were announced, Grace knew that donating the properties to HGSI would foreclose the possibility that the properties would be mined, and that, therefore, the donations would frustrate the financial interest of property owners such as the Peerses, to whom Grace had promised "per ton" mining royalties. This knowledge was established by Grace's awareness of its own obligations under its various agreements; Grace's recognition that donating the properties to an anti-mining organization carried the potential disadvantage of "legal action" by those property owners, (PTX 351); and Mr. Walsh's memorandum of September 17, 1992, which informed Mr. Kohnken that "there are property owners who have vermiculite deposits who consider Ely to be a meddling devil," (PTX 321);

(c) Ms. Ely also knew the Peerses' financial interests would be injured by the donations with covenants not to mine. On cross-examination she admitted knowing that the M.F. Peerses had a financial interest in having their former property mined, (Tr. at 2077); that imposing restrictive covenants not to mine was more injurious than Grace simply retaining the properties without mining them, (Tr. at 2078); and that she was sure the Peerses were "very unhappy" when they learned about the donations to HGSI. (Tr. at 2073.) Moreover, Grace had sent Ms. Ely copies of its leases and mining agreements with the various Louisa County landowners on September 23, 1992. (PTX 324.)

130. Additional evidence of Grace's disregard of the M.F. Peerses' financial interest includes the following:

(a) M.F. Peers's sale price was lower than it otherwise would have been, to take account of the royalties that he expected to receive, (Tr. at 537–37);

(b) When Mr. Poling visited M.F. Peers in September 1992, M.F. Peers told him that Grace either should mine the M.F. Peers parcels or sell them to someone who would mine them, (Tr. at 538–39);

(c) Although by this time Grace already had decided to donate the Peerses' properties to HGSI, Mr. Poling told M.F. Peers he still thought the property might be

mined, (Tr. at 538), and did not mention that Grace was planning to donate the property to HGSI, (Tr. at 539);

(d) Grace did not notify the Peerses of its intent to donate the properties until Mr. Poling unexpectedly telephoned M.F. Peers on the morning of the public announcement, and did not inform them of the donation itself until after the deed already had been executed, (PTX 43);

(e) The M.F. Peers donation deed contained detailed restrictive covenants that prohibited the property from being mined; and

(f) Grace never mined the M.F. Peers properties or paid any royalty to the M.F. Peerses. (Stip.¶ 29.)

131. Additional evidence of Grace's intentional disregard of the A.D. Peerses' financial interest includes the following:

(a) Despite having previously made advanced royalties payments to the A.D. Peerses, those payments apparently ended after the donations were made, as one of Grace's motives in donating the properties was to reduce its carrying costs;

(b) On October 16, 1992, the A.D. Peerses wrote to Grace, stating that because Grace was not going to mine the property, they wished to exercise their right to buy back Parcel A, (PTX 330);

(c) The A.D. Peerses sought to buy back Parcel A to sell or lease it to a third party that would mine it;

(d) On October 27, 1992, Grace responded, assuring A.D. Peers that it had not yet finalized plans to donate the A.D. Peers property to HGSI, and informing him that he therefore could not buy back Parcel A, (PTX 329, 332);

(e) Contrary to its representations to A.D. Peers, Grace already had decided by this time to donate the A.D. Peers proper-

ty to HGSI, and to include restrictive covenants not to mine in the deed of gift;

(f) On November 13, 1992, A.D. Peers wrote a letter to Grace, expressing relief at Grace's assurances that it had not yet had definitive discussions with HGSI about the donations;

(g) Grace disregarded A.D. Peers's letter, deciding not to respond until Grace determined whether VVL's Brandy B permit carried enough restrictions to make a delay of the A.D. Peers donation worthwhile, (PTX 332);

(h) Grace and HGSI entered into an understanding to delay the donation of the A.D. Peers property, (*see supra*);

(i) On August 16, 1993, M.F. Peers wrote to Mr. Grace out of "desperation and anger," essentially begging Grace not to donate the A.D. Peers property to HGSI, a group they had "fought for 20 years," because the Peerses wanted the property to be mined, (PTX 44);

(j) Grace disregarded this plea, and three months later, (once the *Brandy* decision ensured that VVL would have enough reserves to stay in business in Virginia), Grace gave notice to the A.D. Peerses that it intended to donate the A.D. Peers property to HGSI, (Stip.¶ 87);

(k) When the A.D. Peers property ultimately was transferred in 1994, Grace and HGSI had an understanding that HGSI would prevent the mining of the A.D. Peers property to the same extent called for by the written restrictive covenants; and

(*l*) Grace never mined the A.D. Peers properties or paid a per ton royalty to the A.D. Peerses for vermiculite actually mined. (Stip.¶ 38.)

132. When the agreement to delay the A.D. Peers donation is reduced to its essence, it appears to have been designed

specifically to frustrate A.D. Peers's interest in obtaining mining royalties from his property. A.D. Peers intended to satisfy that interest by calling upon Grace's competitor to mine the property, which is what Grace took measures to prevent. (PTX 331, 402.) Therefore, Grace not only intentionally disregarded A.D. Peers's financial interest, but acted with the specific intent that his financial interest be frustrated. Such conduct is a nearly perfect example of a breach of the duty of good faith and fair dealing.

133. All of this evidence established by clear and convincing evidence that when Grace donated the Peerses' properties to HGSI, Grace acted in furtherance of its own interest, with intentional disregard of the financial interest of the A.D. Peerses and M.F. Peerses.

134. Therefore, Grace exercised its contractual discretion in bad faith when it donated the A.D. Peers and M.F. Peers properties to HGSI, and the means by which those donations were executed was unlawful.

135. The court concludes that VVL proved by clear and convincing evidence that HGSI and Grace combined, associated, agreed, mutually undertook or concerted together for the purpose of willfully and maliciously injuring VVL in its reputation, trade, business, and profession, and that they did so by unlawful means. *See* Va. Code § 18.2–499. The final question is whether this joint undertaking caused VVL any injury, as is required to establish civil liability pursuant to § 18.2–500.

## C. CAUSATION AND INJURY

136. Under the Virginia Conspiracy Act, the plaintiff must show the defendants' concerted action caused it injury in order to be entitled either to damages under § 18.2–500(a) or to injunctive relief under § 18.2–500(b). *See Multi–Channel*

*TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 108 F.3d 522, 527 (4th Cir.1997) ("CQC was liable for statutory conspiracy if clear and convincing evidence showed that ... the conspiratorial actions of CQC and one or more of the other defendants caused Adelphia to suffer damages."); *Advanced Marine Enters., Inc. v. PRC Inc.,* 256 Va. 106, 501 S.E.2d 148, 158 (1998) ("[S]ubsection (b) does not expressly refer to a 'person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2–499,' yet this requirement is clearly a predicate for recovery under the statute in equity, as well as in law."); *CaterCorp, Inc. v. Catering Concepts, Inc.,* 246 Va. 22, 431 S.E.2d 277, 282 (1993) ("[T]he plaintiff may be entitled to an injunction if it proves ... the conspiracy involving defendants and that, because of Henicheck's affiliation with defendants, plaintiff will suffer irreparable injury ...."); *Eshbaugh v. Amoco Oil Co.,* 234 Va. 74, 360 S.E.2d 350, 351 (1987) (noting, for statute of limitations purposes, that "a cause of action for conspiracy under Code § 18.2–500 accrues when one is 'injured in his ... business'" (quoting *Gallop v. Sharp,* 179 Va. 335, 19 S.E.2d 84, 86 (1942)); *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 596 (1984) ("To recover in an action for conspiracy to harm a business, the plaintiff must prove ... resulting damage ....")); *Nida v. Business Advisory Sys., Inc.,* 44 Va. Cir. 487, 499–500, 1998 WL 972125 (1998), *reprinted at* 1998 Va. Cir. LEXIS 22 (same).

137. As stated by the Supreme Court of Appeals of Virginia:

The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlaw-

ful means. In other words, the basis of the action is the wrong which is done under the conspiracy and which results in damage to the plaintiff. No cause of action exists without the resulting injury, and the damage produced must arise as the effective result of the conspiracy.

*Gallop v. Sharp*, 179 Va. 335, 19 S.E.2d 84, 86 (1942).

138. Because VVL failed to establish by a preponderance of the evidence that HGSI's and Grace's concerted actions caused, threatened to cause, or will cause VVL to suffer any injury, *see supra*, VVL failed to establish the same by clear and convincing evidence.

139. The findings of fact and conclusions of law recited *supra* demonstrate that although Grace and HGSI acted in concert to injure VVL in its reputation, trade, business, and profession, VVL did not satisfy its burdens of proving that Grace intended to monopolize a discernable part of interstate commerce, or that Grace's and HGSI's concerted actions injured VVL or harmed competition.

140. On reading the Findings of Fact for the case, one develops an intuitive conclusion that the plaintiff will prevail. It is only upon a consideration of the relevant statutes, and of the cases which have interpreted and applied those statutes, that the conclusion set out herein in favor of the defendant is properly reached, contrary to that intuitive thought the result may be.

141. The court accordingly concludes that:

(1) HGSI is not liable for conspiring to monopolize in violation of the Sherman Act, 15 U.S.C. § 2;

(2) HGSI is not liable for conspiring to monopolize in violation of the Virginia Antitrust Act, Va.Code § 59.1–9.6; and

(3) HGSI is not liable for conspiring to injure VVL in its reputation, trade, business, or profession, in violation of the Virginia Conspiracy Act, Va.Code §§ 18.2–499, –500.

Pursuant to Federal Rule of Civil Procedure 58, final judgment shall be entered by separate order contemporaneously herewith.

TABLE 1

NORTH AMERICAN VERMICULITE CONCENTRATE SALES

Short Tons

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|---|---|
| VVL | 30,423 | 35,206 | 33,895 | 40,270 | 44,342 | 41,967 | 44,579 | 49,091 |
| CVC | 23,432 | 22,208 | 26,628 | 31,388 | 30,034 | 31,120 | 33,206 | 31,399 |
| VVL/CVC Total | 53,855 | 57,414 | 60,523 | 71,658 | 74,376 | 73,087 | 77,785 | 80,490 |
| Grace External | 35,350 | 42,096 | 49,578 | 48,383 | 47,304 | 46,520 | 47,600 | 44,786 |
| Grace Internal | 50,807 | 61,691 | 57,703 | 51,239 | 49,279 | 40,705 | 55,422 | 60,043 |
| Grace Total | 86,157 | 103,787 | 107,281 | 99,622 | 96,583 | 87,225 | 103,022 | 104,829 |
| Total Imports | 40,783 | 45,460 | 41,801 | 46,763 | 61,638 | 59,882 | 77,222 | 85,605 |

Total Sales  180,795  206,661  209,605  218,043  232,597  220,194  258,029  270,924